Johnnie F. TURPEN, Plaintiff-Appellant,

v.

MISSOURI–KANSAS–TEXAS
RAILROAD COMPANY,
Defendant-Appellee.

No. 83–1493.

United States Court of Appeals,
Fifth Circuit.

July 19, 1984.

Rehearing Denied Aug. 2, 1984.

Jenkins & Watkins, David Watkins, Dallas, Tex., for plaintiff-appellant.

Worsham, Forsythe & Sampels, Robert A. Wooldridge, Richard L. Adams, Dallas, Tex., for Missouri-Kansas-Texas R. Co.

Before BROWN, GEE, and RUBIN, Circuit Judges.

GEE, Circuit Judge:

Plaintiff Johnnie F. Turpen, a Seventh-Day Adventist, was discharged from his temporary employment with the defendant Missouri-Kansas-Texas Railroad ("the Katy") because, following his religious belief, he did not report for work on his Sabbath. After pursuing his union grievance proceedings to no avail, Turpen instituted this religious discrimination suit under section 701(j) of Title VII, 42 U.S.C. § 2000e(j), against the Katy. On the basis of all the evidence, the district court found that the Katy had not violated section 701(j) and dismissed the action. Turpen appeals, arguing that the district court misconstrued the employer's burden of proof under section 701(j) and that the efforts made by the Katy did not meet the statutory requirement as set out below. We conclude that the district court required the correct proof of the Katy and was not clearly erroneous in finding that the Katy made a good faith effort to accommodate Turpen and that further measures would

result in "undue hardship" to the Katy. We therefore affirm.

### Background

For the 29 years preceding March 1980, Turpen was employed by the Rock Island Railroad ("the Rock Island") as a carman at the Peach Yard in Fort Worth, Texas. He became a Seventh-Day Adventist in 1974; by that time he was sufficiently high on the seniority roster to enable him to bid on jobs that would allow him to have Friday nights and Saturdays off, accommodating his Sabbath.[1]

In March 1980, the Rock Island went into receivership and terminated all its employees. Portions of its lines were taken over on an interim basis by several national rail carriers. Pursuant to special legislation, 45 U.S.C. § 901 et seq., these carriers, including the Katy, and those unions that had had collective bargaining agreements with the Rock Island, including Turpen's union, the Brotherhood of Railway Carmen (BRC),[2] entered into a Labor Protective Agreement dated March 4, 1980 ("March 4 agreement") covering Rock Island employees taken into the employ of interim service operators over the Rock Island lines. The Katy obtained ICC authority to operate the Rock Island trackage at the Peach Yard in May of 1980. The March 4 agreement provided that the collective bargaining agreement in effect between BRC and the Katy would apply to any former Rock Island employees the Katy chose to employ. To avoid delays in operations, the agreement also allowed the Katy to hire former Rock Island employees on a temporary basis while negotiating an agreement concerning the manner in which seniority would be allocated between the Katy's existing employees and the former Rock Island employees.

When the Katy began operating the Peach Yard, it agreed that should it be unable to operate the trackage with its existing employees, it would give former Rock Island employees the right of first hire based on their seniority on the Rock Island roster. In setting up the 24 hours a day, seven days a week schedule for the Peach Yard, the Katy determined that six additional employees were needed to man the operation and hired the top six off the Rock Island roster; Turpen was number four. Pursuant to the March 4 agreement, the temporary employees selected their positions in order of seniority. To permanently fill these jobs, however, the Katy had to post the jobs, accept bids and fill the jobs according to its contract with BRC. The schedule for these temporary employees drawn up by the Katy provided three positions with Friday evenings and Saturdays off.[3] These three jobs were selected by the three former Rock Island employees with greater seniority than Turpen.

Turpen reported to work with the Katy as a temporary employee on June 16, 1980. Upon returning his completed applications forms just before starting to work, he informed Burt Lawson, the Katy representative in charge of hiring for the temporary positions, of his desire to have Friday evenings and Saturdays off to accommodate his religious beliefs. At that time, Lawson gave Turpen a schedule that required working on Friday evenings and Saturdays, but he also told Turpen that he had reported the schedule request to his superior, Martin Rister. Rister, however, testified that Lawson did not contact him about Turpen until the next Monday, June 23.

Rister testified that upon receiving the call from Lawson he contacted his boss, Harold Hacker, who instructed him to at-

---

**1.** A tenet of the Seventh Day Adventist church is strictly to observe the Sabbath from sundown Friday to sundown Saturday as a day of rest.

**2.** Turpen originally joined BRC as a defendant, alleging that it had breached its duty of fair representation. The district court rejected Turpen's claim against BRC, and Turpen does not appeal this portion of the ruling.

**3.** The collective bargaining agreement between BRC and the Katy provided that jobs should be structured so that employees worked for five consecutive days and had two consecutive days off.

tempt to rearrange the schedule so as to allow Turpen to have his requested days off. Rister worked on the schedule for "about an hour and a half," but was unable to rearrange the schedule so that it met the needs of the railroad and satisfied the collective bargaining agreement, while accommodating Turpen's religious beliefs. He called Hacker back and told him rescheduling was impossible.

Turpen worked the week of June 16th, including working after sundown on Friday, June 20. On Saturday, the 21st, he called in to say that he would not be able to report to work that day for religious reasons. On Monday the 23rd he received a reprimand from the Katy for "not protecting his trick." Turpen responded that he would not work during his Sabbath, but was told that he had to report as assigned. Two days later Turpen drafted a letter in which he stated that he would not work Friday evenings or Saturdays, but offered to work another shift, including a "swing" (mixed) shift, or to pay the difference between straight time and overtime that the Katy would have to pay to fill his job on Friday evenings and Saturdays. Rister testified that he had considered and rejected the swing shift option in attempting to alter the schedule to accommodate Turpen.

A few days later, Rister conferred with BRC representative Henry Lamance to determine whether a solution could be found for Turpen's scheduling problem. Rister learned from Lamance that Turpen's coworkers were aware of his desire to have rest days on his Sabbath and that they had complained to Lamance about being called to protect Turpen's assignment. Although voluntary swaps between employees were not barred by the collective bargaining agreement at this point because these positions were temporary, Lamance's description of the other employees' attitude toward Turpen discouraged Rister from further pursuit of the possibility of a voluntary swap between Turpen and an employee who, by virtue of his seniority, had obtained a position with Saturdays off. Rister also learned that the Union refused to waive the "job choice by seniority" pro-

visions of the collective bargaining agreement. Thus, no involuntary swaps could have been ordered by the Katy.

Turpen left his post early, without authorization, on Friday, June 27th, at sundown. He did not report to work on the following day, Saturday the 28th. The Katy scheduled a formal investigation of Turpen's failure to report to his assigned "trick" and his refusal to report in the future during his Sabbath. As a result of this hearing, Turpen was suspended from active service; a few days later, on July 7th, 1980, he was discharged. The BRC processed Turpen's discharge grievance, but did not succeed in getting Turpen reinstated.

The final bids on the Peach Yard jobs were accepted by the other former Rock Island employees in the latter part of July 1980, and became permanent jobs as of August 1, 1980. The positions established in the temporary schedule remained in effect, and the three positions offering Friday evenings and Saturdays off were bid and filled by the three employees senior to Turpen. The Katy ceased operation of the Rock Island trackage at the Peach Yard on December 31, 1981, and all the former Rock Island employees were terminated from service at that time.

On July 19, 1980, Turpen filed charges of religious discrimination with the EEOC. In October of that year the EEOC issued a finding of probable cause to believe that religious discrimination had occurred. Attempts at conciliation followed; when these proved ineffective, the EEOC issued Turpen a "right to sue" letter. Plaintiff timely filed his original complaint in federal district court on September 9, 1981. After a bench trial, the district court dismissed the action, finding that the Katy had not breached its duty under section 701(j) to attempt reasonable accommodation to the bona fide religious needs of the plaintiff and that further accommodations would have imposed an undue hardship on the Katy's operations.

*The Employer's Burden under 701(j)*

Title VII's prohibition of religious discrimination in employment, 42 U.S.C. § 2000e(j), provides that an employer engages in an unfair employment practice if he discriminates against an employee because of any aspect of his religious practices or beliefs, unless the employer shows that he cannot "reasonably accommodate" the employee's religious needs without "undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).[4]

▪ A plaintiff in a section 701(j) case makes out a prima facie case of religious discrimination by proving: (1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; (3) he or she was disciplined for failure to comply with the conflicting employment requirement. *See, e.g., Brener v. Diagnostic Center Hospital,* 671 F.2d 141, 144 (5th Cir.1982), and cases cited therein. This Circuit has also held that the determination of probable cause by an administrative agency is also admissible to establish a prima facie case. *Smith v. Universal Services,* 454 F.2d 154 (5th Cir.1972). The trial court found, and the defendant does not contest, that Turpen made out a prima facie case.

▪ With a prima facie case established, the burden shifts to the employer to show that it was unable reasonably to accommodate the plaintiff's religious needs without undue hardship. *See, e.g., Brener,*

671 F.2d at 144. As the Supreme Court recognized in the leading case construing the scope of the employer's duty, *Trans World Airlines v. Hardison,* 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977), courts must balance the prohibitions of the Establishment Clause of state-mandated favoritism in employment on the basis of religion and the respect for "bona fide" seniority systems built into the statutory scheme of Title VII against Congress' intent in § 701(j) to correct discrimination on the basis of religion. *Hardison* held that the statute does not require an employer to deviate from its seniority system in order to give an employee shift preference for religious reasons, 432 U.S. at 81, 97 S.Ct. at 2275, and that accommodation that would require an employer to incur a greater than de minimis cost or would create a greater than de minimis imposition on co-workers constitutes undue hardship. *Id.* at 84, 97 S.Ct. at 2276.

▪ We must uphold the district court's factual determinations on the interlocking issues of "reasonable accommodation" and "undue hardship" unless they appear clearly erroneous. *Brener,* 671 F.2d at 146; *cf. Pullman Standard v. Swint,* 456 U.S. 273, 287–90, 102 S.Ct. 1781, 1789–91, 72 L.Ed.2d 66 (1982) (trial court's finding on discriminatory intent for the purposes of section 703(h) of Title VII, 42 U.S.C. § 2000e–2(h), is a finding of fact subject to the clearly erroneous standard of Fed.R.Civ.P. 52(a)).[5] We cannot find clear error.

---

**4.** 42 U.S.C. § 2000e(j) provides:

(j) The term "religion includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

42 U.S.C. § 2000e–2(a)(1) provides, in pertinent part:

(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges

of employment, because of such individual's race, color, religion, sex, or national origin. . . .

**5.** Plaintiff contends that the trial court incorrectly defined the employer's burden on the issues of "reasonable accommodation" and "undue hardship," applying a mere burden of production rather than one of proof. As plaintiff notes, the court's opinion does refer at one point to the obligation of the employer as a "burden of production," and our *Brener* decision—handed down after *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)—binds us to a "burden of proof" standard in a 42 U.S.C. 2000e(j) case such as this. Indeed, the statute itself specifically requires the employer to "demonstrate" that he

Plaintiff contends that the Katy failed in its statutory duty in that it did not adequately investigate three possibilities: (a) rescheduling so that Turpen would have a "swing shift" that left him free on Friday and Saturday; (b) swapping Turpen with one of the employees whose greater seniority had enabled him to choose a position with Friday and Saturday off; or (c) paying another employee overtime, the extra costs being reimbursed by Turpen. The district court found that the Katy did not violate the statute in rejecting each of these suggestions.

Rister's unchallenged testimony established that he had spent about an hour and a half attempting to rework the schedule; one of the possibilities that he stated he investigated was having Turpen work a "swing" shift. He was unable to come up with a solution that would meet the railroad's needs and conform to the seniority provisions of the collective bargaining agreement. At trial, plaintiff produced a proposed schedule in which Turpen held a swing shift enabling him to have his Sabbath off. The Katy objected that this schedule did not allow them to have three men working the first shift on Monday, an arrangement they claim was necessary in order to service efficiently the cars needing repair that had accumulated over the weekend, when repairs were not performed. In response, Turpen put forward evidence that when, in December 1980, one of the three employees who worked the first trick on Monday became ill and did not return to work, the railroad filled the third slot on a temporary basis rather than a permanent basis, and occasionally did not fill it at all. The district court, apparently, was not impressed with this argument: it found that "the proposed alternative schedule would have severely decreased the efficiency of

[the Katy's] operation at the Peach Yard and adversely affected interstate commerce." Similarly, we do not read the fact that the Katy filled the third Monday slot on a temporary rather than permanent basis during the year before terminating operations altogether to indicate that the Katy's asserted need for three men on the first Monday shift was pretextual.

Since the union refused to waive the seniority provisions of the collective bargaining agreement in force by virtue of the March 4 agreement, the Katy would have had to contravene the "job choice by seniority" provisions of the collective bargaining agreement in order to effectuate an involuntary swap. As *Hardison* holds, "Title VII does not require an employer ... to deprive senior employees of their seniority rights in order to accommodate a junior employee's religious practices." *Hardison*, 432 U.S. at 83, note 14, 97 S.Ct. at 2276, note 14. Prior to final bidding, however, the collective bargaining agreement would not have precluded a voluntary swap. However, the district court found that the Katy made a "reasonable assumption" in not pursuing this option, since Rister's conversation with Lamance regarding the other employee's complaints about filling in for Turpen indicated that "such an inquiry [regarding a voluntary swap] would have been futile." We cannot say that this finding is clearly erroneous. Moreover, we do not construe section 701(j) to require an employer to bypass duly elected bargaining representatives to negotiate directly with individual employees. Such a construction would run counter to basic principles of national labor policy as expressed with specific regard to the railway industry in the Railway Labor Act. *See generally* 45 U.S.C. §§ 152, 156 (calling for bargaining

is unable to accommodate without undue hardship, and "demonstrate" is a synonym for "prove."

Despite its passing reference to a burden of production, however, the court went on to make a specific finding of numerous subsidiary facts on these issues (No. 23) and a conclusion of law that "[t]o accommodate Plaintiff's religious beliefs and practices, M–K–T would have incurred

an undue hardship. The costs to the M–K–T for such accommodation would have been greater than de minimus." We regard this conclusion as a finding of ultimate fact, and we are not bound by the label placed on it by the trial court. *Gilmore v. Constitution Life Ins. Co.,* 502 F.2d 1344 (10th Cir.1974); *Gulf King Shrimp Co. v. Wirtz,* 407 F.2d 508 (5th Cir.1969). To it the "clearly erroneous" standard of review applies.

between the carrier and the union representative).

Finally, we conclude that the district court did not clearly err in finding that to require the Katy to hire an overtime employee and bill Turpen for the additional wages would have necessitated a greater than de minimis cost and interference with operations and would thus have been an "undue hardship." [6]

■ Section 701(j) mandates that an employer make good faith efforts to accommodate an employee's religious beliefs. It does not require that in doing so an employer override an established seniority system, nor does it require an employer to take steps that go beyond those that a reasonable person would take. Although the record does not indicate that the Katy bent over backwards to accommodate Turpen, we cannot say that the district court was clearly erroneous in finding that the railroad satisfied its statutory duty. The judgment below is

AFFIRMED.

---

6. The court found, with adequate support in the evidence:

23. M–K–T attempted to rearrange the schedule of the employees at the Peach Yard to allow four employees to have from sundown on Friday until sundown on Saturday as off days. The schedule could not be rearranged without extensive costs, far greater than de minimus, to the M–K–T. The only proposed alternative schedule presented would have severely decreased the efficiency of M–K–T's operation at the Peach Yard and adversely affected interstate commerce. M–K–T also considered Plaintiff's suggestion that he would pay the overtime differential for other employees to work his shift. This suggestion also would have worked an undue hardship on M–K–T. There were only five other employees to begin with. M–K–T had a duty to equalize overtime. The other employees would not voluntarily protect Plaintiff's assignment. Such an arrangement would have violated the 5 day workweek provision of the collective bargaining agreement. In addition, the cost of such arrangement would have far exceeded the overtime differential. Substantial costs would be involved to keep track of and bill Plaintiff for different employees every week working part of his shift on Fridays and his shift on Saturdays.