757 F.2d 476
 37 Fair Empl.Prac.Cas. 404,
36 Empl. Prac. Dec. P 35,144, 53 USLW 2460,
23 Ed. Law Rep. 1205
 Ronald PHILBROOK, Appellant,
v.
ANSONIA BOARD OF EDUCATION and Nicholas Collicelli, Dr.
Charles J. Connors, Kenneth Eaton, William Evans, Del
Matricaria, Susan Schumacher, Faith Tingley, Robert E.
Zuraw, Ansonia Federation of Teachers, Local 1012, AFL-CIO,
Jose Neves, Kathleen Roberts, Mary Ghirardini, Dennis
Gleason, Dominick Golia, Maureen Wilkinson, and Georgette
Williams, Appellees.
 No. 397, Docket 84-7548.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 14, 1984.
Decided March 7, 1985.
 
 David N. Rosen, New Haven, Conn., for appellant.
 Thomas N. Sullivan, Hartford, Conn. (Robert J. Murphy, Hartford, Conn., of counsel), for appellees Ansonia Bd. of Educ. and the Individual School Bd. Members.
 Robert F. McWeeney, Hartford, Conn., for Appellees Ansonia Federation of Teachers, Local 1012, and Union Officers.
 Before OAKES and KEARSE, Circuit Judges, and POLLACK, District Judge.*
 OAKES, Circuit Judge:
 
 
 1
 Ronald Philbrook, a high school teacher in Ansonia, Connecticut, appeals from a judgment of the United States District Court for the District of Connecticut, Thomas F. Murphy, Judge, after a bench trial, finding that he failed to prove his claim of religious discrimination in employment against the Ansonia Board of Education (the "school board") and the Ansonia Federation of Teachers, Local 1012 (the "union"). Philbrook, a member of the Worldwide Church of God, claims that the school board's leave policies violate Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e-2 (1982), and the free exercise clause of the First Amendment. Reaching only the statutory issue, we reverse and remand.
 
 BACKGROUND
 
 2
 Appellant has taught typing and business at Ansonia High School since 1962. Some time later he began studying and observing the teachings of the Worldwide Church of God. In February, 1968, he was baptized into the church, of which he remains a member. The tenets of the church require members to refrain from secular employment on certain designated holy days each year. These holy days are determined with reference to the Hebrew calendar. Thus they often fall on different days in different years. Several of these holy days usually fall during a school week. Appellant estimated that if he is to observe the required holy days he will have to miss approximately six school days each year.
 
 
 3
 The school board's leave policies, as outlined in collective bargaining agreements with the union, have changed over time:
 
 
 4
 A. In 1966, the school board and the union, then recognized as the exclusive bargaining representative for Ansonia's teachers, entered into an agreement that provided for five days' leave "for personal and or legal reasons." The agreement also provided for accident and sick leave but said nothing about leave for religious reasons.
 
 
 5
 B. The 1967-1968 contract provided for annual leave of 18 days, cumulative to a total of 150 days, for "personal illness, illness in the immediate family which requires the presence of the teacher, ... compulsory court appearance as party or witness." It also provided that teachers could use annual leave for other reasons, such as "weddings," a "death in the immediate family," and "personal reasons," limiting weddings and death in the family to a specified number of days and allowing "personal reasons" leave only "at [the] Sup[erintenden]t's discretion." The agreement also stated that teachers could take up to three days' leave "for observance of Religious Holy Days which church laws make obligatory." Religious leave, however, could not be charged or accumulated as annual leave.
 
 
 6
 C. The 1968-1969 contract contained many of the same provisions, yet provided for three days per year for "legitimate and necessary personal business at the teacher's discretion," and included the three days for religious observance as annual leave days, which presumably were cumulative.
 
 
 7
 While none of these early agreements expressly stated that personal business leave could not be used for religious observance, it appears that the school board interpreted these categories as exclusive. Later contracts makes the exclusivity explicit. The 1969-1970 contract again allowed three days for personal business and three days for religious holidays, but the latter were no longer part of annual leave. Moreover, it stated that "[n]o annual leave, including accumulated days, shall be used for absence due to Religious Holidays in excess of 3 days per year." The 1970-1971 contract added a provision stating that personal business leave days could not be used for any of a number of enumerated activities, including "[a]ny religious activity."[1]
 
 
 8
 The next modification of the restrictions on personal business leave is evinced by the agreement for 1978 through 1982. The contract still provided for three days, but only one was at the teacher's discretion. The other two would be authorized only after the teacher gave the reason for his or her absence. The current agreement, in effect until 1985, contains the same leave provisions.[2]
 
 
 9
 From 1967 through 1976, appellant took unauthorized absences for religious holidays in excess of three days per year, for which the school board docked appellant's salary. Although some of the contracts during this period appear to leave the reason for personal business absences to the teacher's discretion, appellant claims to have taken no personal business leave on church holy days. In 1976, however, appellant stopped taking unauthorized leaves for religious reasons, claiming that his family could not sustain the financial strain of the docked salary. He began to schedule required hospital visits on church holy days, and on several occasions he worked on a holy day.
 
 
 10
 Appellant claims to have sought relief from both school authorities and the union. The school board has always allowed appellant to take unpaid leave for religious holy days, but appellant has repeatedly suggested two other arrangements. On the one hand, appellant has asked that the school board allow personal business leave to be used for religious observance. On the other hand, appellant has offered to pay the full cost of a substitute instead of being docked the larger pro rata salary deduction for observing religious holy days in excess of the three allotted by contract.[3] Moreover, he has agreed to supervise the substitute and to make up for days missed by doing meaningful school work at other times. The school board has consistently rejected both proposals.
 
 
 11
 Appellant's legal battle seeking accommodation of his religious practices began in 1973 when he filed a complaint against the school board and the union with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the Equal Employment Opportunity Commission ("EEOC"). The CHRO found probable cause to believe that the school board's refusal to allow personal business leave to be used for religious observance constituted religious discrimination, and attempted conciliation. The CHRO's conciliation agreement proposed that the school board and the union agree to "amend [the leave provisions] ... so not to deny employees the use of their accumulated personal business days for observance of Religious Holidays." The agreement also provided appellant with back pay compensation. The school board rejected the proposed conciliation.[4]
 
 
 12
 Soon thereafter the EEOC assumed jurisdiction and also found probable cause. The EEOC attempted conciliation between appellant and the union, but these efforts failed.[5] On September 19, 1977, the EEOC issued a right-to-sue letter.
 
 
 13
 Appellant filed his complaint in federal court on December 16, 1977, alleging that the school board's prohibition from using personal business leave for religious observance violated Title VII and the First Amendment. In addition to charging the school board and the union, appellant added the individual members of the school board and various present and former union officers as defendants. All parties moved for summary judgment, but on April 8, 1983, the district court denied the motions, finding that material facts were in dispute.
 
 
 14
 After a two-day trial, the district court held that appellant had failed to prove religious discrimination. The court's opinion first outlines the facts that were not in dispute. After reviewing appellant's testimony concerning his religious practices, the court declined to find appellant insincere in his religious beliefs, though it had "some doubts of his sincerity." The court made no finding, stating that "we draw no inference of insincerity without more facts. Neither do we find he was sincere." After reviewing what it deemed relevant Supreme Court case law, the court concluded that appellant failed to prove religious discrimination, because he had "not been placed by the School Board or any of its members or by the Union or any defendant officers thereof, in a position of violating his religion or losing his job." In addition, the court stated that it had no jurisdiction over the individual school board members or union officers under Title VII or 42 U.S.C. Sec. 1983.
 
 DISCUSSION
 Appellant's Prima Facie Case
 
 15
 In this case of first impression, we begin by examining Title VII's prohibition against religious discrimination. Under Title VII, an employer cannot discriminate against any employee on the basis of the employee's religious beliefs unless the employer shows that he cannot "reasonably accommodate" the employee's religious needs without "undue hardship on the conduct of the employer's business." 42 U.S.C. Sec. 2000e(j).[6] The parties assume and we agree that Title VII requires the plaintiff to make out a prima facie case of discrimination, after which the burden shifts onto the employer to show that it cannot reasonably accommodate the plaintiff without undue hardship on the conduct of the employer's business. See, e.g., Turpen v. Missouri-Kansas-Texas Railroad Co., 736 F.2d 1022, 1026 (5th Cir.1984); Anderson v. General Dynamics Convair Aerospace Division, 589 F.2d 397, 401 (9th Cir.1978), cert. denied, 442 U.S. 921, 99 S.Ct. 2848, 61 L.Ed.2d 290 (1979). While the district court omitted to apply this burden of proof sequence or to make the findings required under it, necessitating remand, we state the guidelines for the case on remand.
 
 
 16
 We first adopt the approach to plaintiff's prima facie case taken by several courts of appeal:
 
 
 17
 A plaintiff in a [Title VII] case makes out a prima facie case of religious discrimination by proving: (1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; (3) he or she was disciplined for failure to comply with the conflicting employment requirement.
 
 
 18
 Turpen, 736 F.2d at 1026; accord Brown v. General Motors Corp., 601 F.2d 956, 959 (8th Cir.1979); Anderson, 589 F.2d at 401; Redmond v. GAF Corp., 574 F.2d 897, 901 (7th Cir.1978). Moreover, we agree that a finding of probable cause by an administrative agency, such as the EEOC, though not determinative, is admissible to help establish this prima facie case. See, e.g., Smith v. Universal Services, Inc., 454 F.2d 154, 157-58 (5th Cir.1972). On the record before us plaintiff has almost certainly satisfied this prima facie standard.
 
 
 19
 We reject the school board's invitation to hold that appellant has failed to establish the sincerity of his religious beliefs. The district court expressly declined to make any such finding. In fact, on the record below, we would be inclined to reverse a finding of insincerity as clearly erroneous.
 
 
 20
 We acknowledge that it is entirely appropriate, indeed necessary, for a court to engage in analysis of the sincerity--as opposed, of course, to the verity--of someone's religious beliefs in both the free exercise context, see, e.g., United States v. Ballard, 322 U.S. 78, 86, 64 S.Ct. 882, 886, 88 L.Ed. 1148 (1944); Patrick v. LeFevre, 745 F.2d 153, 157 (2d Cir.1984); L. Tribe, American Constitutional Law Sec. 14-11, at 859-61 (1979), and the Title VII context. We see no reason for not regarding the standard for sincerity under Title VII as that used in free exercise cases. See Redmond, 574 F.2d at 901 n. 12; cf. Lewis v. Califano, 616 F.2d 73, 77-81 (3d Cir.1980) (using free exercise standards for determining whether religious belief is a "justifiable cause" for declining surgery under the Social Security regulations). This court has recently held that a sincerity analysis is necessary in order to "differentiat[e] between those beliefs that are held as a matter of conscience and those that are animated by motives of deception and fraud." Patrick, 745 F.2d at 157. In International Society for Krishna Consciousness, Inc. v. Barber, 650 F.2d 430, 441 (2d Cir.1981) (citations omitted), we outlined several factors that indicate insincerity, noting that "an adherent's belief would not be 'sincere' if he acts in a manner inconsistent with that belief ... or if there is evidence that the adherent materially gains by fraudulently hiding secular interests behind a veil of religious doctrine." The Barber court also stated that "the religion's size and history" is relevant to the sincerity determination. Id. The burden on plaintiff, however, is not a heavy one. We must avoid any test that might turn on "the factfinder's own idea of what a religion should resemble." L. Tribe, supra, at 861.
 
 
 21
 The school board argues that appellant's failure to take unpaid leave on holy days during the past several years shows that appellant has acted in a manner inconsistent with his "beliefs," and therefore that those beliefs were not sincerely held. We cannot agree. From 1968 through 1976 appellant accepted the docking of his pay to take off the holy days for which religious leave was not provided. After 1976 he worked on certain holy days because he could no longer afford the docking of his salary. We find it distinctly unpalatable for the school board to argue that a lack of sincerity was evidenced because after many years of paying for his extra holy days the appellant stopped paying and obeyed the school board's rules that forbade him from engaging in religious activity on extra days away from school. The school board's leave policy forced appellant to act in a way inconsistent with his religious belief. Appellant's claim that he was reacting to financial pressure rebuts the inference of fraud from his actions. Cf. Note, Religious Exemptions Under the Free Exercise Clause: A Model of Competing Authorities, 90 Yale L.J. 350, 371 (1980) (arguing that for purposes of disallowing religious tax exemptions there should be "affirmative proof of fraud"); see also Ballard, 322 U.S. at 92-95, 64 S.Ct. at 889-890 (Jackson, J., dissenting).
 
 
 22
 In addition, we note that, while the district court had "some doubts of his sincerity because of his vagueness and claimed poor memory of when and where he attended religious services," it wisely declined to make a finding of insincerity without "a full exposition of facts," Patrick, 745 F.2d at 157. Moreover, it correctly noted that even if appellant was not a regular churchgoer, it "would have trouble" in making a finding of insincerity. Appellant's financial compromise and failure to attend services regularly would not, by themselves, mean that he does not believe that he should not work on holy days. Cf. Thomas v. Review Board, 450 U.S. 707, 715, 101 S.Ct. 1425, 1430, 67 L.Ed.2d 624 (1981) (courts are incompetent to arbitrate intrafaith differences where a church member's insincerity is at issue).
 
 
 23
 Turning to the remaining requirements of plaintiff's prima facie showing, appellant gave unrebutted testimony that he informed the school board and the union of his need to be absent on religious holy days, although it is not clear when the union became aware of appellant's needs. On remand, such a finding might be necessary to determine the amount of back pay appellant is entitled to receive, assuming that issue is reached. In addition, it seems clear that appellant suffered a detriment from the conflict between his religious practices and the employment requirements. The district court placed much reliance on the fact that appellant was not forced into a choice between his job and his religious beliefs, but we hold that such a choice cannot be distinguished from the choice here between giving up a portion of his salary and his religious beliefs. While we acknowledge that some courts have stated that discharge was required to make a prima facie showing of discrimination, see, e.g., Brown, 601 F.2d at 959, Title VII prohibits not only discrimination in hiring and firing but also discrimination "with respect to compensation, terms, conditions or privileges."
 
 
 24
 Finally, appellees claim that General Electric Co. v. Gilbert, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), bars appellant from making out a prima facie case of discrimination by simply claiming that appellee's leave policy is "less than all inclusive." In Gilbert, the Supreme Court held that an employer's failure to include pregnancy benefits in its health care plan was not, by itself, sex discrimination. The Court at one point stated that "pregnancy-related disabilities constitute an additional risk, unique to women, and the failure to compensate them for this risk does not destroy the presumed parity of the benefits, accruing to men and women alike." Id. at 139, 97 S.Ct. at 410 (emphasis in original). According to appellees, appellant's need for more than three days' leave for religious holy days is an "additional risk" unique to his faith.
 
 
 25
 Appellees' reliance on Gilbert is misplaced. Gilbert addresses whether a classification based on pregnancy was discriminatory on its face and whether the employees had shown that the health care plan had a discriminatory effect on the basis of sex in terms of benefits received. The language appellees rely on its simply part of an explanation why the employees had failed to show that the General Electric Plan had a discriminatory effect. Here, however, appellant has offered evidence that the Ansonia leave policy facially discriminates on the basis of religion; the collective bargaining agreements in effect since 1969 have explicitly stated that personal business leave days may not be used for "[a]ny religious activity" and thus have afforded some teachers all the leave they need for religious reasons while not extending that benefit to members of religious groups that have more than three holy days per year. Yet even if appellant's claims are analyzed as solely alleging discriminatory effect in this respect, appellees' argument proves too much. Any religious belief can be characterized as an "additional risk." Title VII, at least as applied to religious discrimination, expressly assigns employers a duty to accommodate those beliefs. Moreover, the Supreme Court has recently held that Congress's enactment of the Pregnancy Discrimination Act, 42 U.S.C. Sec. 2000e(k), not only overturned the specific holding in Gilbert "but also rejected the test of discrimination employed by the Court in that case." Newport News Shipbuilding & Dry Dock Co. v. EEOC, 462 U.S. 669, 103 S.Ct. 2622, 2627, 77 L.Ed.2d 89 (1983).
 
 
 26
 "Reasonable Accommodation" and "Undue Hardship"
 
 
 27
 The crucial issues in this case remaining for determination involve interpreting the meaning of and relationship between the terms "reasonable accommodation" and "undue hardship." The central precedent, of course, is Trans World Airlines, Inc. v. Hardison, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977), the only case in which the Supreme Court has addressed "reasonable accommodation" and "undue hardship" under Title VII. In Hardison, the employee, like appellant Philbrook here, a member of the Worldwide Church of God, sought to be excused from work on Saturdays, the church's sabbath. Id. at 67, 97 S.Ct. at 2268. The employer operated a large maintenance and overhaul base around the clock. The employees' shift preferences were resolved on the basis of a seniority system outlined in a collective bargaining agreement. Hardison's problems arose when he transferred into a new division and lost his seniority. Prior to the transfer, he had used his seniority to observe the sabbath regularly. After the transfer, however, the union would not agree to a change of work assignments--which would allow Hardison to have Saturdays off--in violation of the seniority provisions of the collective bargaining agreement. Id. at 68, 97 S.Ct. at 2269. Hardison also proposed to work four days a week, but the proposal was rejected by TWA. The Court noted that
 
 
 28
 Hardison's job was essential, and on weekends he was the only available person on his shift to perform it. To leave the position empty would have impaired supply shop functions, which were critical to airline operations; to fill Hardison's position with a supervisor or an employee from another area would simply have undermanned another operation; and to employ someone not regularly assigned to work Saturdays would have required TWA to pay premium wages.
 
 
 29
 Id. at 68-69, 97 S.Ct. at 2268-2269.
 
 
 30
 The Supreme Court held that the failure to accept these proposed accommodations did not violate Title VII. Addressing what the Court considered the "principal issue" in the case, id. at 83 n. 14, 97 S.Ct. at 2276 n. 14, the Court concluded that the duty to accommodate does not take precedence over seniority rights enunciated in a collective bargaining agreement. Id. at 83, 97 S.Ct. at 2276. And, turning to the issue more pertinent to this case, the Court held that Hardison's four-day work week proposals involved costs to TWA that amounted to "undue hardship." Id. at 84, 97 S.Ct. at 2277. The Court stated that "[t]o require TWA to bear more than a de minimis cost in order to give Hardison Saturdays off is an undue hardship." Id. Finally, the Court noted that giving Hardison Saturdays off by "incurring extra costs to secure a replacement for Hardison" would constitute a "privilege ... allocated according to religious beliefs," id. at 84-85, 97 S.Ct. at 2276-2277, which the Court saw as a form of reverse discrimination.
 
 
 31
 Hardison did not sound a death knell to the employer's duty to accommodate under Title VII. In Anderson, 589 F.2d at 402, the Ninth Circuit rejected a union's argument that any hypothetical hardship constitutes "undue hardship," noting that "[u]ndue means something greater than hardship. Undue hardship cannot be proved by assumptions nor by opinions based on hypothetical facts." Similarly, the Brown court held that speculative costs to the employer could not discharge its burden of proving undue hardship. 601 F.2d at 961.
 
 
 32
 The school board argues that we should find that its longstanding accommodation of three days of paid leave and additional days of unpaid leave for religious observance constitutes a reasonable accommodation and thus satisfies its duty to accommodate, citing the Tenth Circuit's decision in Pinsker v. Joint District No. 28J, 735 F.2d 388, 391 (10th Cir.1984). The Pinsker court held that a policy allowing two days of paid leave for religious reasons and additional days of unpaid leave satisfied the duty to accommodate. We presume that Ansonia's leave policy is also "reasonable." And if Title VII's duty to accommodate were to be defined without reference to undue hardship, we would hold that the school board has satisfied its burden. The duty to accommodate, however, cannot be defined without reference to undue hardship. In many circumstances, more than one accommodation could be called "reasonable." Where the employer and the employee each propose a reasonable accommodation, Title VII requires the employer to accept the proposal the employee prefers unless that accommodation causes undue hardship on the employer's conduct of his business.
 
 
 33
 Although the courts interpreting Title VII's duty to accommodate have never expressly articulated this point, their analyses are consistent with this approach. In most cases, the court is called upon to assess only the employee's proposal; the court does not have to assess the propriety of the employer's offering one accommodation but rejecting the employee's proposed accommodation. See Hardison, supra; Turpen, supra. Nevertheless, the Fifth Circuit in Turpen did state, as we have suggested above, that the reasonableness and undue hardship questions were "interlocking." Id. at 1026. Previously, in Brener v. Diagnostic Center Hospital, 671 F.2d 141 (5th Cir.1982), the Fifth Circuit had interpreted the duty to accommodate in the same way we do today. The Brener court analyzed the reasonableness of the employer's proposed accommodation, id. at 145-46, but went on to examine the employee's proposed accommodations to determine whether any did not cause the employer undue hardship. The implication is that, even if the employer proposes a reasonable accommodation it has not satisfied its duty to accommodate unless the employee's suggested accommodations would lead to greater than de minimis cost. The EEOC's recent guidelines on religious discrimination--while not dispositive of the interpretation of Title VII, see Gilbert, 429 U.S. at 140-42, 97 S.Ct. at 410-11--also support the approach we above suggest. See 29 C.F.R. Sec. 1605.2(c)(2) (1984).[7]
 
 
 34
 As noted, appellant has offered two proposed accommodations--the use of personal business leave for religious observance and the payment of the cost of a substitute in exchange for not being docked salary for religious leave in excess of three days. On remand the district court must determine whether accepting either of appellant's proposed accommodations would cause undue hardship. We note, however, that on the record before us it appears that neither of the accommodations would lead to greater than de minimis costs.
 
 
 35
 Appellant clearly prefers that the school board allow him to use personal business leave for religious holy days. The critical factual question concerning this proposal is the past and current scope of the personal business leave provisions. As noted earlier, from 1968 through 1977 three personal business days could be taken at the teacher's discretion, and from 1977 to the present, at least one could be taken at the teacher's discretion. This leaves in the air whether any such day may be taken for any reason except those specifically mentioned, such as religious reasons. Thus, the question is open whether they are usable for various secular purposes, including activities not inconsistent with religious observance. The provision does include the words "legitimate and necessary," but left unsaid is whether leaving the reason to the teacher's discretion abrogates this limiting language. Appellant claims that the provision allows attendance at charity meetings, while the school board argues that its scope is much more narrow. One of the appellant's exhibits at trial--entitled "Teacher Absence Report"--indicates that many teachers have taken at least one personal business day a year and some more than one. It also appears that personal business days are taken more frequently than religious holy days. The presence of a contract provision that allows leave for limited secular activities, such as sick leave or leave for court appearances, does not show that additional paid leave for religious observance in lieu of personal business leave would not cause undue hardship. Employers and unions must be free to outline specific types of paid leaves in a contract without the threat of being charged with religious discrimination. But if the personal business leave provision is as broad as appellant claims, it becomes difficult to believe that dropping the religious exception causes undue hardship.[8]
 
 
 36
 Even if the district court finds that the personal business accommodation would lead to undue hardship--or if the school board and the union were to agree to take the personal business leave provisions out of the contract altogether--the district court must assess the cost of accepting appellant's substitute proposal. Appellant has offered to pay for a substitute and even to work on other days to make up for the time missed. While there is some testimony below concerning the cost of using substitutes, the court never focused on the cost of appellant's proposed accommodation. The Superintendent of Schools testified that it is difficult to find certified substitutes, especially those qualified to teach typing and business; that the quality of learning with a substitute is low; that substitutes often have difficulty keeping discipline; and that when substitutes teach classroom equipment is often damaged. Yet several questions still must be addressed. Because presumably appellant would know about his upcoming religious holy days well in advance, it is possible that he can work out an arrangement that avoids the traditional problems of finding a qualified substitute at the last minute. While we recognize the difficulty of discipline in a high school classroom, it may also be that discipline and teaching difficulties can be avoided in a business course by having appellant closely supervise the substitute.
 
 
 37
 On the record before us, we decline to accept the school board's argument that the substitute accommodation as a matter of law poses greater than de minimis costs. This case thus might well be distinguishable from Hardison. The Hardison Court held that a need for premium pay or a loss of efficiency can cause undue hardship. Under the proposed substitute accommodation, the school board would not be paying premium wages. Appellant is not asking to have his religious activities subsidized, as the school board claims. Appellant has offered to pay the cost of the substitute and to make up for time off: appellant does not ask for payment for time when he is not working.[9] Moreover, we are not ready to hold that the school board has shown that there will be a greater than de minimis loss in efficiency. The Hardison Court held that using a supervisor or an employee from another area amounted to a greater than de minimis cost because it left other operations undermanned. The same problems may not arise under the substitute accommodation. One would suppose that the school system has the ability to find qualified substitutes. If appellant communicates with the substitute before and after the days he must miss, there may well be no appreciable loss in the quality of education, where the number of additional substitute days appears to be three.[10] Cf. Turpen, 736 F.2d at 1028 & n. 6 (holding that it was not clearly erroneous for the district court to find that a substitute accommodation caused undue hardship when there was no built-in system for substitution).
 
 
 38
 The school board also suggests that accommodating appellant would constitute preferential treatment. We disagree. While we acknowledge the cautionary language of the Supreme Court in Hardison, we do not interpret Hardison as vitiating the employer's duty to accommodate. Appellant's proposal for the use of personal business leave for religious observance is not one seeking preferential treatment. He is asking the school board and the union to change its leave policy as applied to everyone. Nor would his substitute accommodation allocate a privilege "according to religious beliefs." Hardison, 432 U.S. at 85, 97 S.Ct. at 2277. Appellant has asked to be treated differently; he has not asked for privileged treatment. In exchange for additional days off, he is willing to make up for time off and pay for the substitute. Differential treatment cannot be equated with privileged treatment. Accepting the school board's argument would "preclude all forms of accommodation and defeat the very purpose behind Sec. 2000e(j)." Brown, 601 F.2d at 962.[11]
 
 Union Liability
 
 39
 Finally, we reject the union's argument that we find it not liable for any religious discrimination on the record before us. Title VII places a duty on unions not "to cause or attempt to cause an employer to discriminate against an individual." 42 U.S.C. Sec. 2000e-2(c)(3). We have stated previously that a union's liability depends on its "responsibility for the discrimination." EEOC v. Enterprise Association Steamfitters Local No. 638, 542 F.2d 579, 586 (2d Cir.1976), cert. denied, 430 U.S. 911, 97 S.Ct. 1186, 51 L.Ed.2d 588 (1977). This conclusion is consistent with that of other courts. See, e.g., Hardison v. Trans World Airlines, Inc., 527 F.2d 33, 42-43 (8th Cir.1975), rev'd on other grounds, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977). In Hardison, the Eighth Circuit wrote that "the union may be held liable if it purposefully acts or refuses to act in a manner which prevents or obstructs a reasonable accommodation by the employer so as to cause the employer to discriminate." Id. at 42. In this case, various union officers testified that they had proposed changes in the collective bargaining agreement's leave policies, but all were rejected. Appellant claims that the union never really pushed for these changes. The union did join appellant in seeking arbitration on appellant's leave policy grievance, but, at the same time, it appears that the union declined to enter into an EEOC conciliation agreement with appellant. Clearly, any further discussion of the issue must await a more detailed development of the facts.[12]
 
 
 40
 Judgment reversed and remanded for proceedings not inconsistent with the foregoing.
 
 POLLACK, Senior District Judge (dissenting):
 
 41
 I dissent and vote to affirm on the unassailable facts found below, substantially for the reasons and authorities contained in District Judge Thomas F. Murphy's persuasive opinion.
 
 
 42
 The issue in this case is whether the School Board should be forced to pay a teacher for not working. There is no indication that the School Board, the Union, or the collective bargaining agreement intended to discriminate against anyone, including plaintiff, on the basis of religion. The School Board and Union, and the membership of the latter, adopted a facially neutral policy giving each employee three days of paid religious leave and three days of paid secular personal leave, which were not to be interchangeable. If an employee wished to take additional religious leave, he was privileged to do so at his own cost without suffering any impact on his employment status.
 
 
 43
 The majority views the School Board's policy as one that facially discriminates on the basis of religion because it "affords some teachers all the leave they need for religious reasons but does not extend that benefit to members of religious groups that have more than three holy days per year." However, neither case law nor the legislative history of the statute support the majority's expansive position that an employer "discriminates" within the meaning of Title VII if he refuses to give an employee more than three paid religious days when the employee desires more paid leave.
 
 
 44
 The legislative history makes it clear that Title VII was not concerned with the "no work-no pay" situation. Rather, as the Senate Floor managers explained, the statute was concerned with discriminatory practices, i.e., the situation where an employer
 
 
 45
 "refuse[d] to hire or to discharge any individual or otherwise to discriminate against him with respect to compensation or terms or conditions of employment because of such individual's race, color, religion, sex, or national origin in such a way as to deprive them of employment opportunities or otherwise affect adversely their employment status."
 
 
 46
 110 Cong.Rec. 7212 (1964) (April 8, 1964) (Interpretative Memorandum of Title VII submitted by Senators Case and Clark) (emphasis added).
 
 
 47
 Moreover, the nature of the discrimination that lies at the base of Title VII matters was starkly explained in language that admits of no confusion. The Senate sponsors stated that:
 
 
 48
 "To discriminate is to make distinctions or differences in the treatment of employees ..."
 
 
 49
 Id. at 7218.
 
 
 50
 Supreme Court opinions also emphasize that Congress enacted Title VII in order to "remov[e] artificial, arbitrary, and unnecessary barriers to employment...." Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). As the Court reiterated in Connecticut v. Teal, 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982), "Title VII strives to achieve equality of opportunity by rooting out 'artificial, arbitrary and unnecessary' employer-created barriers to professional development." Id. at 451, 102 S.Ct. at 2533 (emphasis added).
 
 
 51
 The leave policy at issue here does not make distinctions between employees or deny plaintiff the opportunity to pursue his employment and yet have time off to observe his religious holy days. This is not a case where plaintiff is denied employment because his religious beliefs preclude him from working on certain days. See, e.g., Reid v. Memphis Publishing Co., 468 F.2d 346 (6th Cir.1972). Nor is plaintiff subject to discharge because his religion forbids him to work on these days. See, e.g., Brown v. General Motors Corp., 601 F.2d 956 (8th Cir.1979). Likewise, the policy has no adverse impact on plaintiff's opportunities for advancement; plaintiff has not been denied a promotion because of his religious beliefs. See, e.g., Haring v. Blumenthal, 471 F.Supp. 1172 (S.D.N.Y.1979).
 
 
 52
 The School Board's policy neither deprives the plaintiff of employment opportunities nor adversely affects his employment status. As Judge Murphy succinctly stated, "[P]laintiff could go without let or hindrance whenever and wherever he wished" (Op. at 13)--but at his own expense. Since the policy does not "discriminate" within Title VII's use and meaning of that term, the statute may not be invoked against the School Board.
 
 
 53
 It is also clear that the Board has agreeably and reasonably accommodated the plaintiff. Recently, in Pinsker v. Joint District No. 28J, 735 F.2d 388 (10th Cir.1984), the Tenth Circuit held that a school board made a reasonable accommodation by permitting a teacher to take unpaid leave for religious observance. In Pinsker, teachers had a pool of 12 days of paid leave, of which two could be used for "special leave" purposes including religious observance. Plaintiff argued that Title VII required the Board to adopt a leave policy that was less burdensome to religious practices. The court disagreed, stating that the statute does not require employers to "accommodate the employee's practices in such a way that spares the employee any cost whatsoever." Id. at 390-91.
 
 In Pinsker, the court also held that
 
 54
 "[d]efendant's policy and practices jeopardized neither [plaintiff's] job nor his observation of religious holidays. Because teachers are likely to have not only different religions but also different degrees of devotion to their religions, a school district cannot be expected to negotiate leave policies broad enough to suit every employee's religious needs perfectly."
 
 
 55
 Id. at 391.
 
 
 56
 The neutral leave policy challenged here is embodied in a valid collective bargaining agreement. "Collective bargaining, aimed at effecting workable and enforceable agreements between management and labor, lies at the core of our national labor policy ..." Trans World Airlines, Inc. v. Hardison, 432 U.S. 63, 79, 97 S.Ct. 2264, 2274, 53 L.Ed.2d 113 (1977). Where, as here, the agreement neither impairs employment status nor imposes any artificial, arbitrary, and unnecessary barriers to employment, then, as the Supreme Court stated in Hardison, "we do not believe that the duty to accommodate requires [the employer] to take steps inconsistent with the otherwise valid [collective bargaining agreement]." Id. Paid leave from employment is neither contractually nor Constitutionally mandated.
 
 
 57
 Since the School Board's leave policy does not discriminate on the basis of religion, plaintiff failed--as early as the close of his case--to make out a prima facie case. Consequently, the judgment of dismissal should be affirmed.
 
 
 
 *
 Of the Southern District of New York, sitting by designation
 
 
 [1]
 The agreement for 1971-1972 also changed the salary deduction for unauthorized absences. Previously, a teacher would have been docked 1/200 of his or her salary for an unauthorized absence, but after 1971 the deduction was increased to 1/180 of the teacher's annual salary
 
 
 [2]
 The current contract, which, one would have to say, speaks by the book, provides in pertinent part:
 A. Annual Leave
 Eighteen (18) days of annual leave cumulative to 180 days shall be granted for personal illness and/or illness in the immediate family (spouse, children, parents, and family members residing in household), which requires the presence of the professional staff member, and within the limits stated below: limit of 2 days per
 
 
 *
 1. Death in the immediate family 5 day limit each time
 2. Family funeral attendance 1 day each time
 3. Friend Funeral attendance 1 day each time-limit
 of 2 days per year
* 4. Immediate family wedding 1 day each time
* 5. Immediate family graduation 1 day each time
* 6. Immediate family religious 1 day each time
 ceremony (Ordination,
 Vows. Bar Mitzvah, Bas
 Mitzvah, First Communion,
 Baptism)
 7. Official delegate to national 1 day per year
 veterans organization
 8. Official delegate (President 1 day per year-with
 and/or Business Agent) to out charge
 national or state teachers
 organization
 9. Official delegate (other than 1 day per year
 President and/or Business
 Agent)-(limit of 3) to
 national or state teachers
 organization
 10. Mandated religious 3 days per-year
 observance without charge
 Those holidays which are required by and obligatory
 due to written denominational law shall be considered
 as authorized leave and shall not be charged to annual
 leave, including accumulated days. No annual leave,
 including accumulated days, shall be used for absence
 due to religious holidays in excess of three days per
 year.
 11. Necessary personal business 3 days total per year
 a. Necessary personal 1 day per year
 business
 Granted at the discretion of the professional staff
 member with 48 hour notification to the immediate
 supervisor. Professional staff member will note
 pesonal day on the form provided by Board of Education.
 b. Necessary personal 2 days per year
 business with approval
 Professional staff member must request the days for
 personal business on a form provided by the Board of
 Education forty-eight (48) hours prior to such leave.
 Reasons for such leave may be stated in general terms
 if the professional staff member is concerned with
 protecting the confidential nature of the personal
 business. The professional staff member shall make
 all reasonable efforts to plan and conduct personal
 business so that it does not conflict with assigned
 professional duties. Exceptions regarding the forty-
 eight (48) hour notice provision and/or use of
 prepared form may be made in cases of emergencies.
 Necessary personal business shall not include (without
 limitations):
 1. Marriage attendance or participation;
 2. Day following marriage or wedding trip;
 3. Attendnce or participation in a sporting or recreational event;
 4. Any religious observance;
 5. Travel associated with any provision of annual
 leave;
 Purpose set forth under annual leave or another
 leave provision of this contract.
* Immediate family shall be defined as spouse, children, parents,
 step-parrents, grandparents, brothers, sisters, parents-in-law, family members
 residing in the professional staff member's household
 Absence due to any judicial proceeding in which the professional staff member is a plaintiff or defendant or is a witness under subpoena shall be considered as authorized leave and shall not be charged to annual leave, including accumulated days.
 Absence due to jury duty shall be considered as authorized leave and shall not be charged to annual leave. Immediately upon notice of the possibility of the teacher serving jury duty, such notice shall be communicated to the teacher's principal. All teachers shall make every effort to be excused from jury duty.
 The Board may require satisfactory proof of illness after a professional staff member is absent for four (4) consecutive school days on account of illness. Such proof of illness may also be required of a professional staff member's immediate family member if the professional staff member is absent for four (4) consecutive school days on account of the immediate family member's illness.
 For absence other than for personal illness and not authorized herein, a salary deduction equal to 1/180th of the annual salary shall be made.
 Any travel by a professional staff member, conducted in connection with and/or at the time of any school holiday, vacation, school commencement in September or school termination in June shall be arranged where possible, in advance, so as not to conflict with assigned or required professional duties.
 
 
 [3]
 In 1984, it cost $30 per day to hire a substitute, while the school board would have docked appellant over $130 for one unauthorized absence
 
 
 [4]
 After the Connecticut Supreme Court decided Corey v. Avco-Lycoming Division, 163 Conn. 309, 307 A.2d 155 (1972), cert. denied, 409 U.S. 1116, 93 S.Ct. 903, 34 L.Ed.2d 699 (1973), limiting an employer's duty to accommodate employees' religious beliefs under the Connecticut Fair Employment Practice Act, the CHRO ended its conciliation efforts
 
 
 [5]
 In 1975, the union instituted a grievance proceeding against the school board on behalf of appellant. The only issue before the arbitrator, however, was the meaning of the Ansonia collective bargaining agreement. The arbitrator denied the grievance
 
 
 [6]
 42 U.S.C. Sec. 2000e(j) provides:
 (j) The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.
 42 U.S.C. Sec. 2000e-2(a)(1) provides, in pertinent part:
 (a) It shall be an unlawful employment practice for an employer--
 (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin....
 The legislative history provides little assistance in interpreting Sec. 2000e(j). See Trans World Airlines, Inc. v. Hardison, 432 U.S. 63, 74-75 & n. 9, 97 S.Ct. 2264, 2271-2272 & n. 9, 53 L.Ed.2d 113 (1977).
 
 
 [7]
 Section 1605.2(c)(2) provides:
 (2) When there is more than one method of accommodation available which would not cause undue hardship, the Commission will determine whether the accommodation offered is reasonable by examining:
 (i) The alternatives for accommodation considered by the employer or labor organization; and
 (ii) The alternatives for accommodation, if any, actually offered to the individual requiring accommodation. Some alternatives for accommodating religious practices might disadvantage the individual with respect to his or her employment opportunites [sic ], such as compensation, terms, conditions, or privileges of employment. Therefore, when there is more than one means of accommodation which would not cause undue hardship, the employer or labor organization must offer the alternative which least disadvantages the individual with respect to his or her employment opportunities.
 
 
 [8]
 On remand, the district court must make findings about the use of personal business leave from 1968 through the present. Appellant does not only seek prospective relief; he also seeks back pay
 In its brief on appeal, the school board seems to assume that the burden is on appellant to show that the personal business accommodation would not cause undue hardship. It is not: once appellant has made out a prima facie case, the school board has the burden of showing that an accommodation would cause undue hardship.
 
 
 [9]
 The district court also thought appellant wanted something for nothing. Certainly it was overlooking his offer to work extra hours to make up for days missed. The court noted an analogous federal statute providing a government employee with "abstention from work during certain periods of time" for religious reasons if the employee "engage[s] in overtime work for time lost," 5 U.S.C. Sec. 5550a (1982), yet the court incorrectly stated that appellant "agrees with everything but the work part." The statute appears to support, not weaken, appellant's claim
 
 
 [10]
 29 C.F.R. Sec. 1605.2(d)(1)(i) advocates the use of "voluntary substitutes" as an example of reasonable accommodation without undue hardship:
 (i) Voluntary Substitutes and "Swaps"
 Reasonable accommodation without undue hardship is generally possible where a voluntary substitute with substantially similar qualifications is available. One means of substitution is the voluntary swap. In a number of cases, the securing of a substitute has been left entirely up to the individual seeking the accommodation. The Commission believes that the obligation to accommodate requires that employers and labor organizations facilitate the securing of a voluntary substitute with substantially similar qualifications. Some means of doing this which employers and labor organizations should consider are: to publicize policies regarding accommodation and voluntary substitution; to promote an atmosphere in which such substitutions are favorably regarded; to provide a central file, bulletin board or other means for matching voluntary substitutes with positions for which substitutes are needed.
 
 
 [11]
 Perhaps Hardison may be read as equating "undue hardship" with preferential treatment. That is to say, accepting an accommodation that would lead to greater than de minimis costs to the employer constitutes under Hardison preferential treatment when looked at from the perspective of the employees. Yet accepting a proposal that would not cause undue hardship, does not constitute preferential treatment. We need not reach this question, however
 Moreover, in light of our remand, we do not address the hypothetical question whether accepting either of appellant's proposed accommodations constitutes an unconstitutional establishment of religion. We do note, however, that several courts of appeals have held that Title VII's duty to accommodate does not run afoul of the First Amendment. See McDaniel v. Essex International, Inc., 696 F.2d 34, 37 (6th Cir.1982); Tooley v. Martin-Marietta Corp., 648 F.2d 1239, 1244-46 (9th Cir.), cert. denied, 454 U.S. 1098, 102 S.Ct. 671, 70 L.Ed.2d 639 (1981); Nottelson v. Smith Steel Workers, 643 F.2d 445, 453-55 (7th Cir.), cert. denied, 454 U.S. 1046, 102 S.Ct. 587, 70 L.Ed.2d 488 (1981); Hardison v. Trans World Airlines, Inc., 527 F.2d 33, 43-44 (8th Cir.1975), rev'd on other grounds, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977).
 
 
 [12]
 The district court held it had no "jurisdiction" over the individual school board members and the union officers. Appellant does not raise this issue on appeal and, therefore, we do not address it
 While we reach only the Title VII issues, the First Amendment issues remain open, if appellant should lose on the Title VII issues on remand.