**James W. HOLMES; Charles Todd; and Wendell Boyd, Plaintiffs-Appellees,**

**v.**

**Ray DONOVAN, Secretary of the U.S. Department of Labor, Defendant-Appellant.**

**William Anderson, et al., Defendants.**

No. 85–5744.

United States Court of Appeals, Sixth Circuit.

Argued April 21, 1986.

Decided July 17, 1986.

Rehearing and Rehearing En Banc Denied Sept. 3, 1986.

Robert M. Williams, Jr., Asst. U.S. Atty., Memphis, Tenn., William H. Berger, argued, U.S. Dept. of Labor, Atlanta, Ga., Ramilro Salazor, Dept. of Labor, Washington, D.C., Jose' Ramiro Salazar, for defendant-appellant.

Donald A. Donati, Memphis, Tenn., for plaintiffs-appellees.

Before WELLFORD and NELSON, Circuit Judges, and EDWARDS, Senior Circuit Judge.

WELLFORD, Circuit Judge.

The Department of Labor appeals the district court's entry of judgment in favor

of plaintiffs-appellees, various union members. The district judge held as a matter of law that the Department of Labor lacked jurisdiction to compel a rerun election for a particular union office because neither the aggrieved party in the union election nor any union member had ever exhausted internal union remedies as required under § 402(a)(1) of the Labor-Management Reporting and Disclosure Act (LMRDA), 29 U.S.C. § 482(a)(1) with respect to the miscount involved. We reverse.

On February 8 and 11, 1984, Local 149 of the Bakery, Confectionary and Tobacco Workers Union ("Union") held its regular triennial election of union officers. The positions that were at stake included business agent [1] and four executive board member positions [2] from the Jackson, Mississippi Frito-Lay plant. Members of the Local who lived in Memphis, Tennessee voted either on February 8 or 11, 1984 in voting machines located in Memphis. Union members living outside of Memphis were sent two ballots: one for union officers and another for board positions from the particular plant where each was employed.

Each candidate was entitled to have a poll watcher and to have a person available for the counting of out-of-town ballots. After the ballots were counted and certified in Memphis on the evenings of February 11 and 13, the results were posted at each plant represented by Local 149.

After the election, plaintiff Holmes filed a protest with the Local, alleging various irregularities and illegalities including the fact that a member of the election commission had apparently obtained a second batch of officer ballots, and that Mr. Anderson, the winner, had used a union car, union supplies, and other items to aid his reelection efforts. The Local refused to take any action, and plaintiff Holmes in accordance with the Union's Constitution requested review by the International. A review was conducted, and the International refused to take any action.

Having exhausted his administrative remedies, Holmes filed a complaint with the Department of Labor alleging that Anderson and other union officers used union assets and equipment to assist him and his slate of candidates, and afforded him campaigning opportunities denied to his opponents; that Anderson held a Labor Day dinner where he solicited money from the Employer companies without accounting for the proceeds; that Anderson and the incumbent chairman of the board of trustees had complete control over out-of-town ballots; and that additional ballots were printed at the request of union officials and that a number of additional ballots were not accounted for.

The Labor Department conducted an investigation of the asserted violations. During the course of the investigation, it was discovered that the tally for the Fourth Executive Board position at the Jackson, Mississippi plant had been miscounted. Plaintiff Boyd, instead of winning by one vote, had actually tied with candidate Lucille Robinson. After being informed of the tie vote, the Union's Business Agent and the Labor Department's Compliance Officer agreed to a voluntary runoff of the election for that one Frito-Lay Executive Board position. The Labor Department ·representative unsuccessfully tried to notify Boyd and Robinson by phone about the rerun election. He was only able to notify Boyd through a subsequently mailed notice of the agreement for the election rerun. This also advised Boyd about a scheduled pre-election conference that Boyd attended. During the pre-election conference, Boyd filed a protest about the runoff with the Department of Labor claiming he had not been given sufficient notice of the rerun election. No charges were filed by Boyd with the Union. The rerun election was held in December 1984, and Robinson defeated Boyd by 10 votes. She thereafter

---

1. Plaintiff-appellee James Holmes and defendant-appellant William Anderson vied for the business agent position, which Anderson won.

2. Eight candidates sought these four positions, including plaintiff-appellee Wendell Boyd.

replaced Boyd on the Executive Board. By letter dated November 15, 1984, Holmes was informed by the Department of Labor that after investigating his complaint, "the only violation affecting outcome involved one Executive Board position. Pursuant to a Voluntary Compliance Agreement, that violation is in the process of being remedied."

Only plaintiffs' second cause of action is at issue on appeal involving the question[3] of the authority of the Secretary of Labor to enter into an agreement with Local 149 to conduct a supervised rerun for one of the Executive Board positions. Boyd claims that the Local's Business Agent lacked authority to make such an agreement and that there was a failure to exhaust internal union remedies as required by LMRDA. Plaintiffs sought to enjoin Lucille Robinson, the winner of the runoff election, from serving as a member of the Local's Executive Board and a mandate that Boyd serve instead.

The district court first held that the Local's Business Agent did in fact have delegated authority to enter into the election agreement with the Department of Labor. The court then concluded, however, that the Secretary of Labor lacked authority to enter the runoff election agreement because no union member had complained of the specific miscount irregularity uncovered by the Secretary's investigation. The parties agreed that the hearing on the preliminary injunction would also serve as the hearing on the merits of the claim.

The basic issue on appeal is the Department of Labor's authority to bring about a voluntary agreement with a local union for a runoff election when that agency uncovers an election violation that was not specifically addressed in a grievance to the union. In addressing the scope of the Secretary's authority to pursue through judicial channels election violations uncovered during the course of an investigation, the Supreme Court has twice considered the issue. In *Wirtz v. Local Union No. 125, Laborers' International Union of North*

America, 389 U.S. 477, 88 S.Ct. 639, 19 L.Ed.2d 716 (1968), the Secretary challenged the validity of the general and runoff election for a single office; the runoff had been necessary because of a tie vote in the general election. The complaining union member, the loser in the runoff, had submitted a protest letter to the union, alleging that his opponent was ineligible to run for office and that numerous voters had been ineligible to vote *in the runoff election*. The union provided the complainant no relief, and he filed a complaint with the Secretary pursuant to § 402 of LMRDA. After a thorough investigation, the Secretary uncovered serious election irregularities far greater than the union member had been aware, affecting the runoff *and* general election. The Secretary then tried to invalidate the results of both elections in federal court, and the union claimed that the Secretary exceeded the scope of his authority because no exhaustion had occurred as to the asserted violations in the *general* election.

The Court rejected the union's exhaustion argument stating:

It is true that the exhaustion requirement was regarded by Congress as critical to the statute's objective of fostering union self-government. By channeling members through the internal appellate processes, Congress hoped to accustom members to utilizing the remedies made available within their own organization; at the same time, however, unions were expected to provide responsible and responsive procedures for investigating and redressing members' election grievances. These intertwined objectives are not disserved but furthered by permitting the Secretary to include in his complaint at least any § 401 violation he has discovered which the union had a fair opportunity to consider and redress in connection with a member's initial complaint.

389 U.S. at 484, 88 S.Ct. at 642.

Under the facts before it, the *Local No. 125* Court concluded that the Secretary had

---

**3.** Pursuant to Fed.R.Civ.P. 54(b), the district court entered a final judgment as to this second cause of action so that it would be immediately appealable.

the authority to investigate and remedy the results of the general election because the "overwhelming" evidence of improprieties surrounding the runoff election strongly suggested that the same misconduct had occurred at the earlier general election. Thus, because the alleged wrongdoings were identical, the union essentially had had a "fair opportunity to consider and resolve" all violations. *Id.* at 484–85, 88 S.Ct. at 642–43. The Court concluded: "Again, Congress, having given the Secretary a broad investigative power, cannot have intended that his right to relief be defined by a *complaining member's ignorance of the law or the facts* or by the artlessness of the member's protest." *Id.* at 485, 88 S.Ct. at 643 (emphasis added).

Three years later in *Hodgson v. Local Union 6799, United Steelworkers of America, AFL–CIO,* 403 U.S. 333, 91 S.Ct. 1841, 29 L.Ed.2d 510 (1971), the Court again addressed the scope of the Secretary's authority to investigate and remedy election violations not specifically raised by a union member's complaint. The losing party in a union election complained to the union that the successful incumbent had violated § 401 of LMRDA by using union facilities to prepare various campaign materials. Failing to obtain relief from the union, the unsuccessful candidate filed a complaint with the Secretary, asserting the same objection presented to the union but challenging for the first time the validity of the meeting attendance requirement imposed as a condition for candidacy for union office. After investigation the Secretary found both objections to be meritorious, requesting the union to take voluntary remedial action, which the union refused to do. The Secretary then sought judicial enforcement of its remedial order. The Court held that the union member's failure to object to the meeting attendance requirement during pursuit of his internal union remedies barred the Secretary from subsequently challenging the rule in a § 402(b) action:

> Examination of the relevant legislative materials reveals a clear congressional concern for the need to remedy abuses in union elections without departing needlessly from the longstanding congressional policy against unnecessary governmental interference with internal union affairs, *Wirtz v. Glass Bottle Blowers Assn.,* 389 U.S. 463, 470–71, 88 S.Ct. 643, 647–48, 19 L.Ed.2d 705 (1968).

The introduction to the Senate report accompanying the Act summarizes the general objectives of Congress:

> "A strong independent labor movement is a vital part of American institutions. The shocking abuses revealed by recent investigations have been confined to a few unions. The overwhelming majority are honestly and democratically run. In providing remedies for existing evils the Senate should be careful neither to undermine self-government within the labor movement nor to weaken unions in their role as the bargaining representatives of employees." S.Rep. No. 187, 86th Cong., 1st Sess., 5 (1959), U.S.Code Cong. & Admin.News. 1959, pp. 2318, 2322.

The requirement of § 402(a), that a union member first seek redress of alleged election violations within the union before enlisting the aid of the Secretary, was similarly designed to harmonize the need to eliminate election abuses with a desire to avoid unnecessary governmental intervention. The same Senate Report, in reference to Title IV of the Act and to the exhaustion requirement, states:

> "In filing a complaint the member must show that he has pursued any remedies available to him within the union and any parent body in a timely manner. This rule preserves a maximum amount of independence and self-government by giving every international union the opportunity to correct improper local elections." *Id.* at 21, U.S.Code Cong. & Admin.News 1959, p. 2337.

Plainly Congress intended to foster a situation in which the unions themselves could remedy as many election violations

as possible without the Government's ever becoming involved....

.... The obvious purpose of an exhaustion requirement is not met when the union, during "exhaustion," is given no notice of the defects to be cured. Indeed, the primary objective of the exhaustion requirement is to preserve the vitality of internal union mechanisms for resolving election disputes—mechanisms to decide complaints brought by members of the union themselves. To accept petitioner's contention that a union member, who is aware of the facts underlying an alleged violation, need not first protest this violation to his union before complaining to the Secretary would be needlessly to weaken union self-government....

In this case, it is clear that the protesting member knew of the existence of the meeting-attendance provision and that his election protests to the local and international unions concerned matters wholly unrelated to the rule. We therefore hold that internal union remedies were not properly exhausted and that the Secretary was barred from litigating the claim.

403 U.S. at 338–41, 91 S.Ct. at 1845–46.

As the two Supreme Court decisions made clear, the exhaustion requirement of LMRDA was intended to encourage union members to avail themselves of internal union remedies before seeking government intervention and to give a union the first opportunity to correct election abuses. Furthermore, as the Senate Report on the LMRDA demonstrated, the Act was intended to ensure that "union procedures are democratic.... What is required is the opportunity [for union members] to influence policy and leadership by free and periodic elections." S.Rep. No. 187, 86th Cong., 1st Sess., *reprinted in* 1959 U.S. Code Cong. & Ad.News 2318, 2323.

The LMRDA's exhaustion requirement, under 29 U.S.C. § 482, as it pertains to the Secretary's involvement, becomes relevant only when the Secretary acts upon a union member's complaint by seeking *judicial relief* from alleged union improprieties. In *Wirtz v. Local 191, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America*, 321 F.2d 445, 448–49 (1963), the Second Circuit viewed the exhaustion requirement as essentially relating to the Secretary's standing to sue on behalf of union members. Such a requirement is consistent with the goals underlying LMRDA because when the Secretary sues the union to enforce the members' rights, the Secretary " 'in effect becomes the union member's lawyer' for purposes of enforcing those rights." *Trbovich v. United Mine Workers*, 404 U.S. 528, 539, 92 S.Ct. 630, 636, 30 L.Ed.2d 686 (1972) (quoting remarks of then Sen. John F. Kennedy who introduced the LMRDA in 1958). Because the Secretary acts on behalf of union members in § 402 actions, Congress mandated exhaustion of internal union remedies as a prerequisite to suit in federal court to permit a union to set its own house in order before subjecting it to costly litigation.

In this case the Secretary is not seeking to enforce LMRDA and remedy election violations in federal court. The Secretary's action challenged by union members and not the union arose from its investigatory powers and not a complaint it originated in federal court. Thus, the concerns underlying the exhaustion requirement do not arise in this case where the Secretary is not the suing party. The Secretary's investigation uncovered a miscount. Readily recognizing the oversight and miscalculation with respect to the erroneous declaration that Boyd was the winner over Robinson, the union officials entered into a consent agreement to hold a supervised runoff election. Suit in federal court was not ever threatened by the Secretary. Despite the fact that the Secretary is not suing to remedy union violations, the plaintiffs in this case contend that exhaustion under § 402 is also a prerequisite to entry of a consent agreement between the Secretary and local with the sole purpose of remedying a vote miscount. We reject this contention.

In *Calhoon v. Harvey,* 379 U.S. 134, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964), the first Supreme Court decision to address interpretation of LMRDA, the Court observed the Act's intent that the Secretary serve as the "clearing house" for union members' complaints. *Id.* at 140, 85 S.Ct. at 296; *see also Driscoll v. International Union of Operating Engineers, Local 139,* 484 F.2d 682, 688–89 (7th Cir.1973), *cert. denied,* 415 U.S. 960, 94 S.Ct. 1490, 39 L.Ed.2d 575 (1974). Based upon the Secretary's "special knowledge," it was left to the Secretary's discretion to determine what course to follow "to serve [best] the public interest." 379 U.S. at 140, 85 S.Ct. at 296. In the public interest, the Secretary was empowered to sue only under specific conditions, but the Secretary was at the same time given broad investigatory powers. *See* 29 U.S.C. § 521. That power to investigate election complaints has been held not to be subject to the exhaustion requirement of 29 U.S.C. § 482. *Local 57, International Union of Operating Engineers v. Wirtz,* 346 F.2d 552, 554 (1st Cir.1965); *Local 191,* 321 F.2d at 446–48. Furthermore, the Secretary may pursue violations without the issuance of a complaint by a union member.

The Secretary's power to investigate would be rendered futile if Congress did not intend the Secretary in his discretion to pursue peaceful negotiations and agreements with a union once a violation has been uncovered.

> Reliance on the discretion of the Secretary is in harmony with the general congressional policy to allow unions great latitude in resolving their own internal controversies, and, where that fails, to utilize the agencies of Government most familiar with union problems to aid in bringing about a settlement through discussion before resort to the courts.

*Calhoon,* 379 U.S. at 140, 85 S.Ct. at 296. Several courts have suggested that the Secretary is authorized to enter into settlement agreements with a union in somewhat comparable circumstances. *See, e.g., Singleton v. Cory,* 465 F.Supp. 14 (S.D.N.Y. 1978) (involving an election agreement without an accompanying lawsuit under 29 U.S.C. § 482; no challenge was made as to the Secretary's authority to enter such agreements); *Brennan v. Connecticut State U.A.W. Community Action Program Council,* 373 F.Supp. 286 (D.Conn. 1974) (concerning entry of judgment pursuant to a stipulated settlement between the Secretary and defendant-union); *Litch v. United Steelworkers of America,* 69 L.R. R.M. 2843 (W.D.Pa.1968) (upholding Secretary's authority to enter into settlement agreements with union). Based upon the statutory and case law background, we conclude, therefore, that the Secretary's authority to investigate the election complaints reasonably includes an equivalent authorization to pursue voluntary out-of-court settlements with a union once a violation is discovered in the reasonable course of a lawful investigation.

In reaching such agreements, however, the Secretary may not abuse his discretion by obtaining agreements on terms unfavorable to union members; by failing to secure remedies for current violations; and by generally acting contrary to the policies underlying LMRDA. *See, e.g., Singleton,* 465 F.Supp. at 20; *Connecticut State U.A.W.,* 373 F.Supp. at 287–88 and n. 1. Where, as here, such settlement provides real relief for a violation or miscount, it serves the Act's goals by avoiding the "costs and risks of litigation" that otherwise a union might be forced to undergo. This settlement minimized the Secretary's role and enabled the union to act voluntarily in the best interests of all union members to bring about a democratic election.

We rely upon the principles expressed in *Dunlop v. Bachowski,* 421 U.S. 560, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975) as set out in *Singleton*

> involving the relative role of the courts and the Department of Labor in problems arising under ... the Labor-Management Reporting and Disclosure Act. The Department is required to accompany any decision with a sufficient statement of reasons. When such a statement is provided, court review

should ordinarily be confined to examination of the statement; and there should be judicial interference with Department action only where it is so irrational as to be arbitrary and capricious. Trial-type hearings should be avoided except in the rare case. However, such hearings may be justified when the Department completely abrogates its enforcement responsibilities, acts in a blatantly discriminatory manner, or otherwise proceeds in a manner clearly defiant of the statute.

421 U.S. at 572–74, 95 S.Ct. at 1860–61.

465 F.Supp. at 20. In this case the Secretary provided an ample statement of reasons for his decision to enter into the voluntary runoff agreement, and we find no abuse of discretion in that decision. We reverse the district court's determination that it lacked jurisdiction over this matter, finding that the consent agreement reached in this case was a reasonable exercise of the Secretary's authority under the circumstances, and we conclude that the results of the rerun election should stand.