John E. BOOMSMA, Plaintiff,

v.

GREYHOUND FOOD MANAGEMENT, INC., Defendant.

No. G83–819.

United States District Court, W.D. Michigan, S.D.

July 24, 1986.

Donald F. Oosterhouse, Robert A. Buchanan, Grand Rapids, Mich., for plaintiff.

Ronald G. Acho, Livonia, Mich., for defendant.

## OPINION

ENSLEN, District Judge.

This case is before the Court for decision following a rather brief bench trial on plaintiff's claim that defendant discharged him on account of his religious beliefs in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a)(1). The Court held trial in this case on Monday, April 28, 1986. It heard testimony from four (4) witnesses and admitted seventeen (17) exhibits into evidence. For the reasons discussed below, the Court will enter judgment for plaintiff in the amount of $3,088.42, plus a reasonable attorney's fee. *Id.* at § 2000e–5(k). The following opinion constitutes the Court's findings of fact and conclusions of law in accordance with rule 52(a) of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

The parties stipulated to most of the material facts at the beginning of trial. Whenever possible, the Court will distinguish its findings on the disputed facts from its acceptance of the stipulated facts.

Plaintiff was an employee of defendant from October 28, 1968, until October 7, 1977, when he was discharged for refusing to work on Sundays. Plaintiff was a vend-

ing machine routeman, and worked in that capacity servicing vending machines defendant operated at two General Motors Corporation factories in the Grand Rapids area. From his initial date of employment until February 23, 1977, plaintiff worked on vending machines at the Diesel Equipment Division plant, which is located in Wyoming, Michigan. On February 23, 1977, plaintiff was transferred, or "bumped", to the Fisher Body No. 1 plant, which is located in Grand Rapids, Michigan. This transfer or bump was the result of a one-time job reassignment negotiated by defendant and plaintiff's union, Local No. 337 of the International Brotherhood of Teamsters, Chauffeurs, Wharehousemen and Helpers of America. Plaintiff essentially was displaced by another routeman, Mr. Ronald Miller, who had greater seniority and wished to transfer out of Fisher Body No. 1 because of the excessive amount of overtime that was required of employees who worked there. Vending employees located at the Diesel Equipment Division plant worked little, if any, overtime hours.

Plaintiff testified that he is a member of the Christian Reformed Church ("CRC"), and that he has been a member all of his life. He stated that his parents are members of the CRC, that he went to church-supported schools, that he attended membership classes and made a public confession of faith at the age of twenty-one (21), and that he has served two terms as deacon at his church. Plaintiff testified that the official teachings of the church forbid its members from working on Sundays, except in cases of necessity and charity. *See also* Pls. Ex. 2.[1] He did admit, however, that on one occasion he worked for a co-employee who had been called away on a family emergency, and that he had worked on Sundays for an undefined period of time for the Air Force National Guard. As discussed more thoroughly below, the Court

finds that plaintiff possesses a bona fide religious belief that it is contrary to the teachings of the Bible, and of his church, for him to work on Sundays, and that he is required by the CRC to act in accordance with that belief. I also note that defendant does not seriously dispute the validity of plaintiff's religious beliefs or the fact that such beliefs prevent him from working on Sundays.

Up to the time of his transfer to Fisher Body No. 1, in February of 1977, plaintiff's religious beliefs did not interfere with his work schedule, primarily because he could always find another employee to cover the few Sundays he was scheduled to work. The situation was different at defendant's Fisher Body No. 1 branch, however, which employed only three persons (including plaintiff) in plaintiff's job category and required its employees to work a significant amount of overtime to meet the requirements of defendant's vending contract with General Motors. While plaintiff was employed at defendant's Diesel Equipment Division branch, one of his supervisors, Mr. Ron Steffens, was aware of his objection to working on Sundays. When he was transferred to Fisher Body No. 1, plaintiff informed his immediate supervisor, Mr. Al Throop, of his religious objection to working on Sundays. Although it is not critical to the Court's decision, Mr. Throop apparently did not promise plaintiff that he would not be assigned to work on Sundays, but stated only that he would attempt to accommodate plaintiff's religious beliefs. The parties stipulated that plaintiff also spoke to defendant's District Manager, Mr. James E. Buck, about his religious beliefs at the time of the transfer.

Until August of 1977, plaintiff faced no conflicts between his religious beliefs and his work schedule, despite the heavy overtime obligations imposed on defendant's Fisher Body No. 1 employees. From the

---

1. Defendant objected to the introduction of this exhibit on the grounds of relevancy, materiality, and hearsay. It stipulated to its admission, however, subject to the objections of relevancy and materiality. As discussed below, the Court finds from plaintiff's testimony that plaintiff possesses, and did possess at the time of the relevant incidents, a bona fide religious belief that forbids him from working on Sundays. I thus accorded little, if any, weight to this exhibit.

date of his transfer until April 18, 1977, plaintiff was not asked to work any Sunday overtime as the other two branch employees, George Lage and Richard Maddux, agreed to cover his hours. From April 18 to May 9, plaintiff was on sick leave. Plaintiff apparently faced some kind of conflict during the time period from May 10 to May 28, but was able to avoid any serious difficulty because Mr. Lage and Mr. Maddux again agreed to cover for him. From May 28th to July 18th plaintiff again was on sick leave. Approximately three weeks after his return from sick leave, plaintiff was asked to work on Sunday, August 7, 1977. It appears that Mr. Lage and Mr. Maddux had invoked their contractual right not to work that day, and that defendant thus was required to ask plaintiff, who had the lowest seniority of the three, to work. Plaintiff did not show up for work, and subsequently was reprimanded. Def. Ex. 6.

Plaintiff was also asked to work the following Sunday, the fourteenth of August. He then went to his union steward, Mr. Maddux, for assistance in dealing with this problem. Mr. Maddux informed the plaintiff, however, that there was nothing the union could do to assist him. Plaintiff also went to his supervisor, Mr. Throop, with his problem. He asked Mr. Throop if he could secure his own replacement for the fourteenth. The parties stipulated that Mr. Throop was not agreeable to this suggestion. Plaintiff testified without contradiction that Mr. Throop explicitly stated that he would not allow a replacement. Sometime between his conversation with Mr. Throop and his scheduled workday of August 14th, plaintiff received a telephone call from Mr. Miller, the person who had bumped him from his position at Diesel Equipment Division, concerning his problem. Mr. Miller offered to work for plaintiff on his scheduled Sundays. Defendant does not dispute that Mr. Miller was qualified to fill plaintiff's position. Plaintiff and Mr. Miller did not discuss the proposed substitution in detail, however. Plaintiff, moreover, did not inform Mr. Throop, Mr. Buck, or the union of Mr. Miller's offer. Plaintiff testified that he assumed from the strength of Mr. Throop's earlier rejection of his voluntary substitution idea that it would have been useless for him to have approached Mr. Throop again on the idea. Defendant offered no evidence, moreover, that it would have allowed plaintiff to accept Mr. Miller's offer. The Court also notes that plaintiff did not file a grievance on his first reprimand.

Plaintiff failed to appear for work on the 14th. Defendant accordingly suspended him for three days without pay. Def. Ex. 7; *see* Def. Ex. 1, schedule A, art. IX, section 3, para. 22. Plaintiff's next scheduled day for Sunday work was September 11, 1977. He again failed to appear, and was disciplined on the following Monday for absenteeism. At a disciplinary hearing held on the 12th, defendant decided to suspend plaintiff temporarily pending efforts to resolve the situation. Def. Ex. 8; *see* Def. Ex. 2, Opinion and Award, at 7. On September 28, 1977, defendant, through a letter from its District Manager, Mr. James E. Buck, offered "to allow [plaintiff] to work only those hours necessary to service the vending machines at the Grand Rapids Fisher # 1 plant on those Sundays when [he] would be assigned to work ... and ... [to] allow [him] to have sufficient time off to attend regular church services." Def. Ex. 9, at 2. Plaintiff rejected this offer on October 4, 1977, Def. Ex. 2 at 8; *see also* Pl. Ex. 2., and defendant subsequently terminated his employment on October 7, 1977. *See* Def. Ex. 2 at 8.

Plaintiff's union thereafter filed a grievance on his behalf contesting defendant's termination of his employment. The parties held an unsuccessful step 1 conference on October 13, 1977. They thereafter held an unsuccessful step 2 conference, or Adjustment Board meeting, on December 6, 1977. At this conference or meeting, plaintiff introduced a letter signed by Mr. Miller in which Mr. Miller indicated that he would be willing "to get together with the supervisors and employees of Fisher I to work something out to cover [plaintiff's] Sunday work." Def. Ex. 11. The matter thereafter proceeded to arbitration. While the case was pending before the arbitrator,

plaintiff secured other employment. On July 14, 1978, the arbitrator found that the Union had not established a violation of the just cause and non-discrimination provisions of the contract, but urged the parties to attempt again to work out a satisfactory settlement.

In accordance with the arbitrator's urgings, defendant and plaintiff's union met again to attempt to resolve plaintiff's problem. On August 8, 1978, defendant agreed to allow plaintiff to return to work "without compensation for time lost, and to allow [him] to fulfill any obligatory Sunday work by securing a replacement, which must be a management approved Prophet Foods Co. vending employee who is familiar with the specific area of [plaintiff's] job duties." Pl. Ex. 4. Plaintiff rejected this proposal for three reasons: defendant offered no backpay; defendant did not offer to compensate him for certain medical expenses he had incurred; and he was happy at his new job.

While his grievance was pending, plaintiff had filed a complaint under the Michigan Civil Rights Act with the Michigan Department of Civil Rights. Def. Ex. 3. This charge apparently was cross-filed with the Equal Employment Opportunity Commission. On March 3, 1983, the Michigan Department of Civil Rights issued an order of Dismissal, finding "insufficient grounds on which to issue a charge". Def. Ex. 4. The Equal Employment Opportunity Commission, on plaintiff's request, issued plaintiff a Notice of Right to Sue on April 27, 1983. Pl. Ex. 5. Plaintiff timely filed the present action on July 22, 1983. *See* 42 U.S.C. § 2000e–5(f)(1). The Court will make further factual findings as needed in the next section of its opinion.

## CONCLUSIONS OF LAW

■ This case presents the Court with difficult issues concerning the appropriate scope of Title VII's prohibition of religious discrimination. Title VII provides in part that "[i]t shall be an unlawful employment practice for an employer—(1) to ... discharge any individual ... because of such individual's ... religion...." 42 U.S.C. § 2000e–2(a)(1). The Act further provides that "[t]he term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accomodate to an employee's ... religious observance or practice without undue hardship on the conduct of the employer's business." *Id.* at § 2000e(j). As the United States Supreme Court has noted, subsection (j) imposes on an employer a "statutory obligation to make reasonable accommodation for the religious observances of its employees, short of incurring an undue hardship." *Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63, 75, 97 S.Ct. 2264, 2272, 53 L.Ed.2d 113 (1977). This obligation encompasses efforts to accommodate employees who, because of their religious beliefs, refuse to work on particular days of the week. *See Murphy v. Edge Memorial Hospital,* 550 F.Supp. 1185 (M.D.Ala.1982).

■ Because of the obligation imposed by subsection (j), analysis of a case alleging religious discrimination follows a two-step procedure rather than the traditional three-step sequence the Supreme Court established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973). Under this two-step analysis, a court looks first to whether the plaintiff has established a *prima facie* case of religious discrimination. If he (or she) has, then the Court must determine whether the employer has met its burden of showing "that it cannot reasonably accommodate the plaintiff without undue hardship on the conduct of the employer's business." *Philbrook v. Ansonia Board of Education,* 757 F.2d 476, 481 (2d Cir.1985), *cert. granted,* —— U.S. ——, 106 S.Ct. 848, 88 L.Ed.2d 889 (1986); *see Protos v. Volkswagen of America, Inc.,* 615 F.Supp. 1513, 1518–19 (W.D.Pa.1985). The defendant's burden, however, is one of production rather than persuasion, and the plaintiff bears the ultimate burden of establishing by a preponderance of the evidence that defendant could have reasonably accommodated his religious beliefs and practices without undue hardship, and hence that it unlawfully discriminated

against him. To some extent, then, there is an implicit third step in this analysis; if the defendant meets its burden of production, then the plaintiff bears the burden of rebutting its showing.

■ A *prima facie* case of religious discrimination consists of three parts: (1) the plaintiff has a bona fide religious belief that conflicts with a requirement of his or her employment; (2) the plaintiff has informed the employer of this belief; and (3) the plaintiff was disciplined for failure to comply with the conflicting employment requirement. *Philbrook*, 757 F.2d at 481; *Murphy*, 550 F.Supp. at 1187; *see Dorr v. First Kentucky National Corp.*, 796 F.2d 179, 183 (6th Cir.1986); *Draper v. United States Pipe & Foundry Co.*, 527 F.2d 515, 518–19 (6th Cir.1975). The Court will discuss these three requirements in the order listed.

■ Defendant made little effort to contest plaintiff's bona fide religious belief against working on Sundays. The Court was somewhat disturbed by the testimony that plaintiff had substituted for a fellow employee for Sunday work on one occasion, and by the revelation that plaintiff had performed Sunday duty for the Air Force National Guard. Plaintiff failed to explain how either of these incidents comported with his religious belief against working on Sundays. Nevertheless, as the Second Circuit has noted, the burden on the plaintiff to establish a bona fide religious belief "is not a heavy one." *Philbrook*, 757 F.2d at 482. The issue before the Court, moreover, is whether plaintiff's conduct in August and September of 1977 was motivated by a bona fide religious belief. In addition, it is clear that plaintiff's religious belief conflicted with defendant's requirement that he work on Sundays when scheduled to do so. Based on plaintiff's testimony at trial, and the lack of any probative evidence to the contrary from defendant, the Court finds that plaintiff has satisfied the first part of his *prima facie* case. *See id.*

The Court also finds that plaintiff has satisfied the second part of his *prima facie* case. As I found above, Mr. Steffens was aware of plaintiff's religious objection to working on Sundays when plaintiff was employed at defendant's Diesel Equipment Division branch. It is undisputed, moreover, that at the time of plaintiff's transfer to defendant's Fisher Body No. 1 branch, his new immediate supervisor, Mr. Al Throop, and his district manager, Mr. Buck, were made aware of his religious beliefs.

Finally, the Court has little difficulty in concluding that plaintiff has satisfied the third part of his *prima facie* case. Plaintiff was reprimanded, suspended for three days, and ultimately fired for failing to work on his scheduled Sundays. It is evident from the above discussion of plaintiff's *prima facie* case that the real issue here, as it appears to be in most cases like this, is whether defendant could have reasonably accommodated plaintiff's religious belief without undue hardship.

■ It is undisputed that an employer must at least attempt to accommodate an employee's religious beliefs. *See Hardison*, 432 U.S. at 75–77, 97 S.Ct. at 2272–73; *McDaniel v. Essex International, Inc.*, 571 F.2d 338, 343 (6th Cir.1978). This obligation, moreover, is a continuing one; earlier efforts at adequate accommodation will not excuse a subsequent failure to attempt to accommodate an employee's religious beliefs when circumstances have changed. *Draper*, 527 F.2d at 519. When attempts to reach an accommodation satisfactory to both sides have been made, and have failed, though, the question becomes whether an accommodation that would satisfy the employee would impose an undue hardship on the employer. *See Philbrook*, 757 F.2d at 484.

Despite the interrelationship of these two aspects of subsection (j), however, the Court must still analyze them separately. It must first determine what actions, if any, the employer took to accommodate the employee's religious belief. It must then determine whether such actions, or any actions suggested by plaintiff, would constitute undue hardship.

Defendant argues here that it took reasonable actions to accommodate plaintiff's

religious belief. It notes, for example, that plaintiff's co-employees at the Diesel Equipment branch consistently covered his Sunday hours, and that his two co-employees at the Fisher Body branch covered his Sunday hours for approximately the first six months of his employment there. It is unclear, however, to what extent defendant was involved in these efforts, other than in the role of merely approving voluntary shift changes between plaintiff and his co-employees. Defendant also notes that while plaintiff was at Fisher Body No. 1, his supervisor, Mr. Throop, attempted to establish a schedule whereby plaintiff would work only Saturday overtime, while his two co-employees would handle all of the Sunday overtime. This schedule failed, however, due to the objections of plaintiff's two co-employees. Finally, defendant argues that following plaintiff's failure to have appeared for work on August 7th, August 14th, and September 11th, it engaged in significant efforts to arrange a satisfactory work schedule, and even offered to schedule plaintiff's Sunday hours around his church services. *See* Def. Ex. 9.

Plaintiff notes, however, that defendant's "significant efforts" to accommodate his religious beliefs occurred only after it had placed him on indefinite suspension, and that such efforts ultimately failed. More importantly, though, defendant rejected plaintiff's efforts to arrange a reasonable accommodation after he was reprimanded for failing to appear for work on August 7th. Plaintiff argues that Mr. Throop's emphatic rejection of his suggestion that he be allowed to secure a voluntary substitute evinces defendant's failure to have met its statutory obligation.

■ The Court concludes that defendant failed to engage in efforts to accommodate reasonably plaintiff's religious belief against working on Sundays until after plaintiff had suffered adversely for adhering to such belief. The Court cannot credit defendant for the willingness of Messrs. Lage and Maddux to cover plaintiff's Sunday hours during the spring and summer of 1977. Nor can defendant receive credit for the presence of a summer substitute

who apparently covered some of plaintiff's Sunday assignments; defendant did not establish that it hired this substitute in an effort to accommodate plaintiff's religious belief. The record shows that until plaintiff had already been disciplined three times for refusing to work on Sunday, defendant's only measurable efforts to accommodate his religious beliefs was Mr. Throop's attempt to arrange an overtime schedule that would require plaintiff to work only Saturday overtime. Defendant failed, however, to have Mr. Throop testify as to what efforts he made to implement this schedule, or how the schedule comported with the overtime equalization clause contained in the collective bargaining agreement between defendant and plaintiff's union. Finally, Mr. Throop flatly rejected plaintiff's suggestion, made after plaintiff had received his reprimand, that he be allowed to procure a voluntary substitute for his Sunday work.

■ The Court's conclusion that defendant, at least until after plaintiff had suffered adversely for adhering to his religious belief, had failed to engage in efforts to accommodate reasonably plaintiff's religious belief against working on Sunday does not resolve the issue, however, because defendant argues that the accommodation offered by plaintiff—voluntary substitution—would have caused it to suffer undue hardship. The courts have formulated two definitions of the undue hardship standard that are applicable here. First, they have established that an employer is not required to alter a facially neutral system for scheduling employees simply to accommodate the religious beliefs of one employee, particularly where such system is mandated by a collective bargaining agreement and operates through a seniority system, and to vary from the system would adversely affect other employees. *Hardison*, 432 U.S. at 80–81, 97 S.Ct. at 2274–75; *McDaniel v. Essex International, Inc.*, 696 F.2d 34, 37 (6th Cir.1982); *Murphy*, 550 F.Supp. at 1188–89. The Supreme Court stated in *Hardison* that "[i]t would be anomalous to conclude that by 'reasonable accommodation' Congress

meant that an employee must deny the shift and job preference of some employees, as well as deprive them of their contractual rights, in order to accommodate or prefer the religious needs of others." *Hardison,* 432 U.S. at 81, 97 S.Ct. at 2275; *see McDaniel,* 696 F.2d at 37. An employer operating under a neutral scheduling system, then, is not necessarily required to alter that system to accommodate the religious beliefs of one employee, but rather need only make reasonable efforts to accommodate the employee within such system. *Murphy,* 550 F.Supp. at 1189.

In evaluating such efforts, however, a court must keep in mind a second definition of the undue hardship standard: that an employer need not take action, such as hiring additional employees or paying shift premiums, that would require it to incur "more than a *de minimis* cost." *Id.; see Hardison,* 432 U.S. at 84, 97 S.Ct. at 2277; *McDaniel,* 696 F.2d at 37. Defendant in this case, then, would not have been obligated to hire additional employees to cover plaintiff's Sunday hours.

Defendant focuses its argument, however, on the first definition of undue hardship. It argues that there are two reasons why it did not, and did not have to, take further efforts to accommodate plaintiff's religious beliefs. First, defendant states that the seniority system established by the collective bargaining agreement it had signed in 1975 with plaintiff's union, and the overtime equalization clause contained in such agreement, prohibited it from requiring Messrs. Lage and Maddux to fill plaintiff's Sunday hours. Plaintiff does not dispute this fact, however, and the Court finds that the Supreme Court's decision in *Hardison* establishes that defendant was not required to violate the agreement simply to accommodate plaintiff's religious beliefs.

█ Defendant apparently argues, however, that the collective bargaining agreement also precluded it from adopting plaintiff's request that he be allowed to procure voluntary substitutes to fill his Sunday hours because it prohibited such cross-branch transfers. Defendant's witness,

Ms. Curry, testified at trial that the union would have had to approve any proposal to bring in substitutes, such as Mr. Miller, from other branches. Although this restriction on management is not explicitly stated in the agreement, it apparently falls under the contract's Maintenance of Standards clause. *See* Pl. Ex. 6, art. XV. Ms. Curry further explained that defendant could not have offered plaintiff his job back, with the understanding that he would be responsible for finding persons to fill his Sunday hours, until the union agreed to modify this implicit understanding between it and defendant.

The Court must reject defendant's reliance on this undue hardship defense for two reasons. First, defendant did not explain at trial why it made no effort to see whether workers from other branches would be willing to volunteer to fill plaintiff's Sunday hours, and whether the union would accept such an arrangement, before it disciplined plaintiff for refusing to work on Sundays. The Supreme Court held in *Hardison* only that an employer could not require an employee to fill the overtime hours of another employee who refused to work because of his religious beliefs; it explicitly noted that no employee had volunteered to fill the affected employee's hours in the case before it. *Hardison,* 432 U.S. at 78 & 80–81, 97 S.Ct. at 2273 & 2274–75. The EEOC, moreover, has explicitly recognized voluntary substitutions or swaps as one way for an employer to fulfill its statutory obligation of reasonable accommodation. *See* 29 C.F.R. § 1605.-2(d)(1)(i). Second, defendant failed to convince the Court that allowing plaintiff to have procured a voluntary substitute would have violated the collective bargaining agreement, and that it needed union approval to allow employees to make such substitutions. The arbitrator found that cross-branching was not permissible under the contract. Def. Ex. 2 at 11. It is not clear to the Court, however, whether this prohibition extended to voluntary substitutions, or rather just would have prohibited defendant from requiring employees in other branches to fill plaintiff's Sunday hours.

Ms. Curry testified that defendant could not have brought Mr. Miller over from the Diesel Equipment branch without union approval. It is not clear, however, that this necessarily was the union's position on this issue. The arbitrator noted in his opinion, for example, that the union contended at the arbitration hearing that cross-branching could have been tried, but was discouraged by Mr. Throop. *Id.* at 9.

In summary, defendant did not demonstrate that the collective bargaining agreement explicitly prohibited it from allowing plaintiff to procure a voluntary, qualified, substitute to fill his Sunday hours. More importantly, though, defendant did not explain why it made no effort to explore the voluntary substitution alternative before it disciplined plaintiff for refusing to work on Sundays. Defendant clearly was aware from the moment plaintiff transferred to Fisher Body No. 1 that difficulties probably would arise from his refusal to work on Sundays. The Court finds that defendant did not demonstrate at trial, however, that it attempted to reasonably accommodate plaintiff's religious beliefs, or that an accommodation satisfactory to plaintiff would have caused it to suffer undue hardship. The Court is troubled by plaintiff's failure to have pursued more vigorously efforts to have defendant accommodate his religious beliefs. The statute, however, places the burden on defendant to attempt to accommodate plaintiff's religious beliefs.

For the reasons discussed above, the Court finds that defendant failed to demonstrate a) that it made reasonable efforts to accommodate plaintiff's religious beliefs, and/or b) that an accommodation acceptable to plaintiff would have caused it to suffer undue hardship. In sum, defendant failed to meet its statutory burden, and the Court will enter judgment for the plaintiff.

■ Given the Court's finding, it must determine the relief to which plaintiff is entitled. Unfortunately, there is little evidence in the record on which the Court can base such a determination. Preliminarily, however, I note that plaintiff does not seek reinstatement but rather only backpay, lost fringe benefits, and payment of his attorneys' fees. The Court finds, moreover, that defendant's liability for backpay and fringe benefits ended as of August 8, 1978, when it offered to reinstate plaintiff. Plaintiff rejected this offer because it did not include backpay and compensation for lost fringe benefits, and because he liked his new job. With regard to the first reason, there is no evidence in the record that defendant conditioned its offer of reinstatement on plaintiff's willingness to release his claims for backpay and fringe benefits. With regard to the second reason, the Court sees no reason to punish defendant for plaintiff's decision to stay with his new job. Any monetary loss plaintiff suffered due to the wage differential between his new job and his old job after he rejected defendant's offer of reinstatement was not proximately related to defendant's religious discrimination.

The first element of plaintiff's compensable injury, then, is the wage loss he suffered during the period from September 13, 1977 to August 8, 1978. From September 23, 1977 to January 23, 1978 plaintiff received unemployment benefits. He did not, however, inform the Court of the amount of those benefits. The Court thus has no means for determining plaintiff's overall wage loss during this period, and will not award him any such damages. On January 23, 1978 plaintiff began working for RepcoLite Paints Company. The parties did provide the Court with wage records for that employment. Def. Ex. 12.

To determine plaintiff's wage loss for the period running from January 23, 1978 to August 8, 1978, the Court subtracted the amount plaintiff earned at his new job from the amount he would have earned if he had continued working for defendant. Plaintiff testified at trial that he averaged 44 hours per week with defendant. From January 23, 1978 to May 30, 1978, plaintiff would have made $5.96 per hour working for defendant, or $262.24 per week (gross pay). As of June 1, 1978, plaintiff would have made $6.21 per hour working for defendant, or $273.24 per week (gross pay). Using these figures, plaintiff's monetary damages in the form of lost wages for the

period from January 23, 1978 to August 8, 1978 was $411.70.

Plaintiff also submitted evidence regarding three lost fringe benefits for which he seeks compensation. The first is pension contributions that defendant made on his behalf. For the relevant time period, such contributions would have amounted to $10.00 per week. Plaintiff can claim lost contributions for 49 weeks, for a total loss of $490.00. Second, plaintiff testified that he would have received three weeks paid vacation if he had remained in defendant's employ. The Court thus will credit him with $786.72 in vacation pay. Finally, plaintiff claims $1,400.00 in medical expenses that defendant's insurance would have covered. The claimed expense is for the birth of plaintiff's child on August 18, 1978. Defendant did not contest this claim, and the Court sees no reason to deny it.

Plaintiff's total compensable damages thus are $3,088.42. He is also, of course, entitled to receive a reasonable attorneys' fee, to be determined by the Court. The Court will grant plaintiff fifteen days from the date of this order to submit an appropriate fee petition, which shall include detailed and contemporaneous time records and affidavits from three attorneys in the Grand Rapids area concerning the appropriate hourly fee for the attorneys involved in the case. Defendant shall then have fifteen days to respond to plaintiff's petition and supporting documentation. If necessary, plaintiff shall have seven days to reply to defendant's response. The Court will caution the attorneys that it does not want plaintiff's fee request to evolve into a second, full-fledged litigation, and that it expects both parties to be reasonable in this matter.